**Addendum to Complaint:**

Stewart B. Herman

v.

Katten Muchin Rosenman LLP, Noah S. Heller and Michael I. Verde

April 12, 2025

<u>Table of Contents</u>

<u>Paragraphs</u>

| | | |
|---|---|---|
| I. | Introduction ……………………………………….……....1-2 | |
| II. | Parties………………………………………….………3-4 | |
| III. | Basis for Jurisdiction…………………………………...5-9 | |
| IV. | Facts…………………………………………………...10-92 | |
| V. | Legal Basis for My Claims………………………....93-108 | |
| VI. | Complaints Filed With Agencies…………………….109-116 | |
| VII. | Partners are covered by anti-discrimination law………….117-130 | |
| VIII. | Waiver of Arbitration……………………………..…131 | |
| IX. | Remedies…………………………………..………132-139 | |
| X. | Timeline………………………………………………...140 | |

I. **Introduction**

1.      Pursuant to the instructions in the form of Employment Discrimination
Complaint on the website of the US District Court for the Southern District of
New York, I submit this addendum to my *pro se* complaint under 28 USC
Section 1654 against defendants Katten Muchin Rosenman LLP, Noah Heller
and Michael Verde. This addendum is an integral part of the complaint.
Federal Rule of Civil Procedure 8(b)(1)(B) requires that the defendant admit
or deny each and every allegation in each paragraph and sentence set forth in
this Addendum or set forth on the face of the complaint.

        This is a case of age discrimination and retaliation.  Katten Chief
Executive Officer Noah Heller targeted the successful aircraft-finance practice
group that had been an integral part of Katten for decades for elimination
because its two partners, practice head Timothy Lynes and me, were in their
60s. He moved Lynes into an administrative role; forced out the group's
lawyers that I needed to generate sufficient revenue to remain a successful
partner of the firm; terminated the practice group; forced Lynes to agree to
retire; reassigned the 40-year-old remaining member to another practice
group; tried to coerce me into resigning and waiving my rights by falsely
telling me I had no rights under age-discrimination law or ERISA; fined and
harassed me and deprived me of the privileges of my job for refusing to resign
and for raising age-discrimination claims and ERISA violations; refused in
violation of the firm's partnership agreement to resolve these claims through
mediation and arbitration; suspended me without pay in violation of the

partnership agreement; and fired me (without executive committee approval, in violation of the partnership agreement) for filing complaints with the US Equal Employment Opportunity Commission, the Employee Benefit Security Administration of the US Department of Labor, and the New York State Division of Human Rights. As Heller and Katten general counsel Michael Verde admitted to me, and as Katten deputy general counsel Julie Gottshall admitted in her response to my New York state complaint, Heller took these actions because of his stereotyped views of lawyers in their 60s who had already worked nearly 40 years, and in my case, to keep me from retiring with my pension, which would have vested in 2024.

2.      This complaint presents the following causes of action:

(i) <u>Age discrimination</u>: Discriminating against me by depriving me of the privileges of my position; creating a hostile work environment; attempting to coerce me to resign and give up my pension; harassing, fining and retaliating against me for refusing to resign and give up my pension; and suspending and then terminating me, for the admitted reason of my age while retaining a colleague 20 years younger, in violation of the federal Age Discrimination in Employment Act (ADEA), the New York State Human Rights Law, and the New York City Human Rights Law.

(ii) <u>Denying me my ERISA-protected benefits.</u> Discriminating against me by depriving me of the privileges of my position; creating a hostile work environment; attempting to coerce me to resign and give up my pension; harassing, fining and retaliating against me for refusing to resign and give up

my pension; and suspending and then terminating me, for the admitted reason of preventing me from ever receiving my pension, in violation of Section 510 of the federal Employee Retirement Income Security Act of 1974 (ERISA).

(iii) <u>Use of fraud under ERISA</u>. Using deceit and threats to try to force me to resign from the firm and give up my pension, in violation of Section 511 of ERISA.

(iv) <u>Breach of fiduciary duty under ERISA.</u> Telling me falsely that I had no ERISA-protected rights under the pension plan and Katten's other ERISA plans, in violation of the firm's fiduciary obligation to be truthful to plan participants under Section 404 of ERISA.

(v) <u>Breach of contract.</u> Squeezing out over a period of several years and not replacing the income partners, counsel, associates and paralegals that Katten Chief Executive Officer Noah Heller and practice group head Tim Lynes had promised me in order to induce me to depart my prior firm, and which they knew I needed to service my clients, thereby driving away my clients and prospective clients and crippling my practice and my income, (ii) crushing my efforts to rebuild my practice; (iii) misrepresenting the conditions of my employment to try to induce me to resign from the firm, and suspending me and firing me in violation of the partnership agreement, and refusing to arbitrate in violation of the partnership agreement.

(vi) <u>Promissory estoppel</u>.  Inducing me to leave my prior firm on the promise of a robust growing practice group and then moving the practice head to an administrative role and taking away the other lawyers I needed to support my practice.

(vii) <u>Fraudulent misrepresentation</u>.  Knowingly misrepresenting to me that I would have a robust practice group at Katten whose ongoing growth was strategically important to the firm in order to induce me to leave my prior firm.

(viii) <u>Intentional infliction of emotional distres</u>s.  Intimidating, harassing, and browbeating me in a monthslong campaign to force me to resign from the firm and give up my pension, knowingly causing me such distress that Katten's general counsel mocked me as "unhinged."

(ix) <u>Tortious interference with business relationship.</u>  Retaliating against me by deliberately harming my most lucrative client by suddenly cutting off my communication with that client, throwing pending closings into chaos, ending a relationship I had spent twenty years nurturing, and leaving me without portable business and thus unemployable.

(x) <u>Civil Conspiracy</u>.  Conspiracy by the chief executive officer and the general counsel of Katten to commit unlawful acts as described above.

## II.    **Parties**

3.    <u>Plaintiff.</u>  I, the plaintiff, Stewart B. Herman, reside at 1 Kings Court, Morristown, New Jersey 07960. I was born in 1962.  My email address is stewartherman1118@gmail.com.    My  telephone  number  (cell)  is 201-572-1779.  I was employed by defendant in its New York office from December 6, 2013 to August 4, 2023 with the title of capital partner.

4.    <u>Defendants</u>.  Defendant Katten Muchin Rosenman LLP ("Katten") is an Illinois limited partnership having its principal place of business at 525 West Monroe Street, Chicago, Illinois 60661 and an office with over 200 staff members at 50 Rockefeller Plaza, New York, New York 10020.  Katten is also an active New York Registered Foreign Limited Liability Partnership having New  York  Department  of  State  Identification  Number  3184026 (https://apps.dos.ny.gov/publicInquiry/EntityDisplay).  Katten has no office in New Jersey.  Numerous partners of the defendant are citizens of the State of New York and residents the County of New York (i.e. Manhattan) or County of Westchester.  Defendant Noah S. Heller ("Heller"), who resides at 7 Fernbrook Drive, Chappaqua, County of Westchester, New York, 10514-1320, is a capital partner and Chief Executive Officer of Katten.  Defendant Michael Verde ("Verde"), who resides at 1374 Pelhamdale Avenue, Pelham, County of Westchester, New York 10803-3317, is a capital partner and General Counsel of Katten.  They are resident in Katten's New York office.  They took the actions described herein in their official capacities under Katten's partnership

agreement. Katten is vicariously liable for their actions. Each of Heller and Verde is also a defendant in his individual capacity.

### III.    <u>Basis for Jurisdiction</u>

5.    This Court has subject matter jurisdiction over the claims under the ADEA and ERISA under 28 USC Section 1331 (*Federal Question*), 29 USC Section 626 (for the ADEA claims), and 29 USC Sections 1132(e) and (f) (for the ERISA claims).

6.    This Court has subject matter jurisdiction over the claims under the New York State Human Rights Law and New York City Human Rights Law, and for breach of contract, under 28 USC Section 1337 (*Supplemental Jurisdiction*).

7.    With respect to defendant Katten, this Court also may have subject matter jurisdiction over the claims described in paragraph 6 above under 28 USC Section 1332 (*Diversity of citizenship*). However, if jurisdiction under such section requires that no partner of the defendant be a resident of the plaintiff's state of residence (New Jersey), to the plaintiff's knowledge at least one such partner (David A. Crichlow) is a resident of New Jersey. With respect to defendants Heller and Verde in their individual capacities, this Court has subject matter jurisdiction over the claims described in paragraph above under 28 USC Section 1332 because the plaintiff is a resident of the

State of New Jersey and Heller and Verde are residents of the State of New York.

8.    This Court has personal jurisdiction over the defendants under Federal Rule of Civil Procedure 4(k).

9.    Venue is proper in this Court under 28 USC Section 1391.

## IV.    <u>Facts</u>

### <u>Summary of the Facts</u>

10.    Because of my age (now 62) and that of my practice group leader Tim Lynes (now 65), Katten Chief Executive Officer Noah Heller, over the course of several years, took away the lawyers we had working for us in our aircraft-finance practice group, causing us to lose business, and reassigned Lynes to a full-time administrative role.  He did so despite having induced me to leave my prior firm with the promise I would be part of a longstanding, growing practice group at Katten. In February 2023, he terminated what remained of our practice group. He took these steps, because, as Heller and Katten general counsel Michael Verde told me in an in-person meeting to tell me to resign from the firm, the firm and its malpractice insurer concluded that it presented too great a malpractice risk to the firm to allow lawyers close to retirement to continue to handle client relationships.  They would get careless

knowing they would be collecting their pensions before the mistakes were discovered.

11.     Having told me he was terminating the practice group, Heller refused my specific request to reassign me to another practice area even though he did so for the third remaining member of the group, Brett Seifarth, who is 20 years younger than I am, and even though he did so at the same time for lawyers in other practices that were not sufficiently busy.

12.     Verde told me that Heller and he would not let me stay at the firm until I qualified to retire and start collecting my pension at age 62 because of the malpractice risk.

13.     Once I pointed out to Heller and Verde in writing that their statements and conduct constituted age discrimination and a breach of ERISA's antidiscrimination rule, Heller became angry.   He told me in writing he was upset that I was creating "a record" for litigation.   Heller and Verde then started a campaign to coerce and deceive me into resigning from the firm, giving up my pension, and waiving my rights.. They knowingly falsely told me I was not entitled to the benefit of federal or state anti-discrimination law and told me my only choice was to resign within a short period and waive my rights, or be fired immediately.

14.     Heller also threatened to, and did, retaliate against me for refusing to immediately agree to resign, give up my pension, and waive my rights by retroactively penalizing me 20% of my 2022 annual compensation.  He did so

effective in April 2023, intentionally depriving me of the funds I would need to make my federal and state tax payments on April 15.

15.     After that Heller and Katten general counsel Michael Verde, a former New York City police detective, continued to pressure me to resign and waive my claims against the firm, with Verde calling me on May 25, 2023 and telling me that Heller was very upset that I was still drawing my regular pay without having agreed to resign. As part of their pressure campaign, they blocked me from opening new client matters and representing the firm at industry conferences.  Heller and Verde's course of conduct caused my wife and me to suffer extreme anxiety and sleepless nights.

16.     On June 27, 2023, pursuant to the terms of the firm's partnership agreement, I demanded immediate mediation and arbitration to resolve this matter.  On July 11, 2023, Verde refused, in violation of the firm's partnership agreement.  On July 18, 2023, I reminded Heller and Verde this constituted a violation of the partnership agreement.

17.     On the morning of August 1, 2023, without warning, Heller retaliated against me by suspending me without pay on a monthly payday, intentionally depriving me of the funds I needed to pay my mortgage and other bills that day.  This suspension was without cause, in violation of the firm's partnership agreement.

18.     Two hours later, without warning, Heller cut off my access to firm email, telephone, and document-management systems in the middle of my

closing a transaction for my major client Castlelake, and then asked if I was now ready to sign the waiver and resign.  This conduct also constituted a breach by Heller and Katten of the New York State rule of professional conduct for lawyers to perform services for clients faithfully.  Cutting off my access in the middle of a transaction "shocked" the client (in its own words to me the next day) and forever ended my relationship with it.   Heller's ending my client relationship also meant I now had no portable business which meant I was virtually unemployable.

19.     On August 2, 2023, Heller emailed me to say he did not want to see me anywhere near the firm or himself ever again.  That day I filed complaints with the Equal Employment Opportunity Commission, the New York State Division of Human Rights, and the US Department of Labor and notified Heller and Verde I had done so.  On August 4, 2023, Heller fired me effective 4 pm that day.

**Detailed Discussion of the Facts**

**Despite inducing me to leave my prior firm by promising me a robust aircraft finance team, Katten CEO Noah Heller squeezes the aviation practice group out of existence as its two partners near their 60s.**

20.     The defendant Katten Muchin Rosenman LLP is one of the largest and most profitable law firms in the United States, having over 700 lawyers spread across offices in major American cities, in London, and in Shanghai.  Its reported profits per equity partner in 2023 exceeded $2,200,000.   In 2013

Katten recruited me to join as a partner in the New York office, to practice in Katten's successful aircraft-finance team, founded and led by Timothy Lynes, an award-winning practitioner in this area with a roster of global blue-chip clients including Embraer, the aircraft manufacturer; Apollo Asset Management, an investment firm with $500 billion in assets under management; and Citibank. The practice, based in the firm's DC office, had been at Katten for decades and was well known to me and highly respected in the aviation industry. Although it is not as high-profile a practice as ones such as mergers-and-acquisitions or white-collar criminal defense, it is extremely lucrative. The transaction sizes run into the hundreds of millions of dollars or larger and generate large fees. The practice also tends to generate work for other practice groups including commercial finance, structured finance, private equity, tax, litigation and bankruptcy. Other large very profitable law firms in New York -including Milbank, Davis Polk, Simpson Thacher, Debevoise & Plimpton, and Clifford Chance–have large aircraft finance practices. Because it is a specialized area, however, it takes a long time to develop the skills set needed to run transactions. And because it is a low profile practice, not many junior associates clamor to get into the practice. At the same time, because of the explosive long-term growth in commercial aviation in developing countries, the need for aircraft finance and aircraft finance lawyers continues to grow substantially. The barrier to entry– i.e. the dearth of experienced practitioners– and the long term secular growth trend in aviation make aircraft finance a profitable practice well suited to large firms' profitability and strategic-growth goals.

21.     In 2013, Katten made the strategic decision to expand the aircraft finance to the New York office, which is the center of aircraft finance in the United States.  Katten hired a headhunter, who cold-called me at my office at my prior firm, the large New York law firm Kaye Scholer LLP (since merged into Arnold & Porter LLP). I had not been doing a job search. But the idea of joining a larger aircraft finance practice group that was making strategic growth moves was appealing.  At Kaye Scholer, I did not have enough associates and paralegals to support my work.    As senior executive Joe McConnell at my most important client, Castlelake Aviation, had told me, "Stewart, you are all by yourself over there."  As a result my clients were reluctant to send me their largest, most complicated transactions, which required large teams of lawyers and generated large amounts of revenue for the law firms that handled them. I had received many calls from headhunters over the years, but most of their pitches to go to other firms were unconvincing.  Two things right away convinced me to take Katten's interest seriously: (i) it was so committed to investing in the aviation practice that it had retained a headhunter to conduct a search, for which the firm would customarily pay the headhunter a fee of ⅓ of the first year's compensation of any new hire; and (ii) it was so committed to establishing the credibility of the new New York aviation practice that it actually wanted to hire not one but two new partners at the same time to launch it.

22.     Over the course of several in-person interviews at Katten's New York office in the summer and fall of 2013, Heller and Lynes induced me to resign

from Kaye Scholer and become a partner at Katten on the promise that the aircraft finance practice group was a longstanding strategically important practice at Katten, one the firm was committed to growing. At Katten I would be part of a group of experienced full-time aircraft finance partners, counsel, associates and paralegals including (in addition to associates and paralegals) the following senior members:

•Partner and Aviation Finance Practice Group Leader Tim Lynes

•Partners Jane Cavanaugh, Tom Healey, and Jonathan Goldstein

•Counsel Robyn Mandel; and

•me.

23.     To seal the deal and convince me to accept the offer, Lynes brought Jane, Tom, Robin and senior associate Brett Seifarth (none of whom I had met thus far) up from DC, where they worked, to New York to have lunch with Jonathan (who was being hired at the same time) and me at the BLT Steak restaurant on East 57th Street. It was a wonderful lunch. It gave me confidence that, as Heller and Lynes had promised, I would have a terrific team of full time aircraft finance lawyers to maintain and grow my practice at Katten. Jonathan, who started with me, was especially appealing because his aircraft finance experience nicely complemented my own aircraft leasing experience. We were to be part of Heller and Lynes' strategic vision to expand the DC-based practice group to New York, the seat of aircraft finance. Heller and Lynes also promised more growth to follow, including in Katten's

London office (London being the most important center of aircraft finance outside the United States). And in fact, several months later we brought over senior aviation transactional analyst Bessie Wong with whom I had worked for many years at Kaye Scholer.

24.     The plan was a success. For my longtime client Castlelake, whom I had been representing since its founding in 2006 (and its principals at their prior firm before then), I was able to run seven or more deals at the same time. This included aircraft portfolio trades consisting of 10–15 on-lease aircraft at a time, which required large teams that I did not have at Kaye Scholer and generated fees of $400,000–$600,000 per transaction. Castlelake enjoyed working with and came to rely on my new Katten colleagues. This success was reflected in my annual fee collections, which were growing and eventually exceeded $4.5 million, over four times the business that Katten expected of me. During my tenure at Katten, my annual compensation ranged from just over $900,000 to just over $1,500,000.

25.     Things started to change in 2016. On June 1, 2016, Heller appointed Roger Furey, formerly the Office Managing Partner of the firm's DC office, to the largely ceremonial role of Chairman of Katten. (Furey has since retired.) Heller appointed Lynes to replace Furey as Office Managing Partner of the DC office effective on that date. While he was Office Managing Partner of the DC office, Furey had not been the leader of any practice group, because office managing partner is virtually a full-time commitment. No other Office Managing Partner at Katten is also a practice group leader. For two examples,

(i) the current New York Office Managing Partner, Wendy Cohen, stepped down as co-head of the investment management practice when she became Office Managing Partner; and (ii) the immediate past New York Office Managing Partner, Chris DiAngelo, stepped down as head of the securitization practice when he became Office Managing Partner.  Nevertheless, following Lynes' appointment as Office Managing Partner of the DC office, Lynes remained Aviation Finance Practice Group Leader, as well as a member of the firm's Board of Directors and Collections Committee.   The firm's "Law Firm Leadership Positions and Committees—Specified Roles" describes twelve strategic, management, and administrative roles for an Office Managing Partner and thirteen for a Practice Group Leader.  Predictably, Lynes' duties as Office Managing Partner crowded out the time he needed to spend as aircraft-finance Practice Group Leader as well as to maintain and develop his own practice.  This situation got markedly worse in the last three years I was at the firm, as Lynes' time became consumed with planning and organizing the move of the DC office from 2900 K Street to 1919 Pennsylvania Avenue. At no time did Heller ask me if I thought Lynes was doing a satisfactory job or meeting my needs for a Practice Group Leader.  What I did not realize until my meeting with Heller and Verde on March 16, 2023, described below, is that Heller had moved Lynes to this administrative role to usher Lynes out of client-management and practice-group  responsibilities and toward retirement.

26.     Starting around the same time that Heller appointed Lynes managing partner of the DC office, and over a period of six years, the other lawyers and

paralegals in the aviation practice group started leaving, voluntarily or involuntarily, including to go in-house, to take early retirement, to go to a competitor firm, or for a bad performance review. I had numerous conversations with Lynes saying that in order to stay competitive with aircraft-finance practice groups at other law firms, we needed to replace these colleagues and also bring in and develop first-year associates as those other practice groups did and as other practice groups at Katten did. Lynes agreed but said, curiously, Heller would not give him permission to hire. Lynes said he would keep trying with Heller. I also raised the issue in my mandatory annual self-reviews and compensation meetings. But by early 2023 Heller had intentionally allowed the practice group to dwindle to two partners (Lynes, who worked only on his own matters, and me), one senior associate (Seifarth, who was by then is no longer even doing aviation full time), no counsel, and no paralegals or transaction analysts.

27.    Lynes' insufficient attention to the practice group –especially to those of us in New York-- was manifested in many ways. He never discussed with me any business plan for growing the practice, revenue expectations, my personnel needs, the needs of my clients, or his interactions with Heller. In fact he had little interaction at all with anyone in the group in New York. Jonathan Goldstein left the firm, after regularly asking me, "Have you heard from Tim lately?"

28.    As I later found out, Heller was forcing out or halting the career progress of key members of the aviation practice group, the people that my

clients trusted and that I needed to show the group had viability.  For example, in February 2021 Heller ordered Lynes to fire partner Tom Healey.  Lynes refused and fired two associates and one paralegal (whom I needed) instead. In retaliation, Heller paid Tom Healey so little for his next annual bonus that Tom departed the firm in May 2021 after 20 years at Katten, to go to our competitor Hughes Hubbard & Reed's aircraft finance group.   There he is doing work for Sun Country Airlines, whose new general counsel Rose Neale Tom got to know when I put Tom on Castlelake work.  (Rose's previous job was managing counsel at Castlelake.)  Katten's aircraft finance practice group would have gotten the work of this important and lucrative client if Heller had not forced Tom Healey out of the firm.

29.     Similarly, Heller refused Lynes' efforts to promote our valued counsel Robyn Mandel to partner.  Robyn left the firm as a result.  She is now working as a solo practitioner, where she is capturing work that could have gone to Katten's aircraft finance group.  Robyn was part of the future of this practice. I had spent a lot of time grooming her for partnership.  She was able to run Castlelake transactions-- with six-figure fees --on her own, managing associates and paralegals.

30.     Heller also refused Lynes' efforts to promote our by-then senior associate Brett Seifarth to partner.  In 2022, client Marjan Riggi of Kroll Bond Rating Agency asked me, "Why is Brett still an associate?"  This was just

another negative signal to clients and prospective clients that aviation at Katten had no future.

31.     Similarly, partner Jane Cavanaugh suddenly and mysteriously "retired" at age 60.  I imagine this was another forced termination.

32.     Finally, my 20-year colleague Bessie Wong left the firm out of frustration (or was pushed out?).  She was a senior aviation transaction analyst, who was not a lawyer.  But she could run deals like a senior associate, for half the cost.  Clients loved her and kept asking me why she would ever leave.  I felt really bad for Bessie especially, because Lynes had induced her to leave Kaye Scholer with the promise of a robust career at Katten.

33.     I would also point out that Robyn, Jane and Bessie (and former longtime paralegal Anne Rehders and two departed associates) are women, including a minority woman, in a practice group that by 2023 had only older men.   At Castlelake, the former managing counsel in charge of aviation finance, Rose Neale; the current aviation general counsel, Jeanette Delehanty; and the current aviation in-house counsel and transaction managers I most recently worked with, Allison Koschnick, Emily Flanagan, Sarah Flanagan, Karen Toland, and Kelli Sallemi, are all women.  They want to use outside lawyers who are women.  Once Heller started taking my female colleagues away, Castlelake started shifting work to Alyssa Vazquez at Norton Rose Fulbright, Emily Wicker at Clifford Chance, and Freyda Mechlowicz at Milbank.

34.     As a result of the loss of, and failure to replace, these key personnel, especially personnel younger than Lynes and me who were needed to ensure the continuity of the practice group, clients and the market came to perceive– correctly– that the practice group was being wound down.  Castlelake told me it could not give me as much work any longer because I did not have enough people to handle it –including the people Castlelake had come to know and trust-- and because it looked like the practice group, down to two men in their 60s sharing one associate with other practice groups, was going away. Castlelake could not give billion-dollar multi-aircraft sale-leaseback deals – which require continual deal servicing by outside counsel over the six-to-eight-year term of the lease—to a practice group that would not even be around that long.  And it was also very obvious that I didn't have enough staffing for the transactions that Castlelake did give me.   Castlelake complained that I had to do junior associate and paralegal work—such as sending out signature pages—myself, at my high billing rate.

35.     The manpower situation got so dire that in 2021, I went to Chris DiAngelo, then managing partner of the New York office, to ask if any transactional associates, income partners, counsel, staff attorneys or paralegals were available anywhere in our 700-lawyer firm to help me.  He told Lynes and me, in an in-person meeting in the New York office, that everyone was busy and no one – no one-- was available.  In response, Lynes did nothing.

36.     What was clear was that I could no longer handle the transactions for which I was best known at Castlelake, the acquisitions and dispositions of

large portfolios of on-lease aircraft, generating the large six-figure fees. Castlelake stopped giving me transactions like these because Heller had deprived me of the manpower to staff them.

37.     Heller later made the pretextual statement to me (at the March 16, 2023 meeting I discuss further below), "We thought your practice would bounce back from the pandemic. It didn't." This was nonsense. Castlelake actually expanded during the pandemic, opening a New York office through which it is doing very large new multi-aircraft aircraft financings with dollar values over $500 million per transaction. It became a lender of last resort to many airlines around the world who needed large amounts of liquidity to make it through the pandemic. Castlelake, in fact, did $8 billion in aircraft-finance transactions between 2020 and 2022. In addition, in 2021 Castlelake did a large internal restructuring that involved 80 aircraft and months of work. Castlelake was just not going to entrust multi-aircraft multi-hundred-million- dollar deals that require a team of lawyers to someone whose team was gone.

38.     Castlelake has over $20 billion in assets under management, and is the lessor or lender for over 400 aircraft at any one time. It must have a legal spend of over $10 million per year on outside counsel. I had a better relationship with Castlelake than any counsel out there, going back to the beginning of the firm (and before), with the firm's chief executive officer (Evan Carruthers), and doing work for that client continuously until Heller fired me. In fact, I worked on the very first aircraft transaction that Castlelake

ever did.  Katten was losing that work because the aviation practice group did not have the personnel to handle these large transactions and because Castlelake perceived the practice group was being wound down.

39.    In addition, during the pandemic there was a large number of aircraft workouts and restructurings – completely consistent with my own aircraft restructuring experience—that have kept large New York law firms Clifford Chance, Milbank, Vedder Price, Hughes Hubbard and Holland & Knight's aircraft finance and bankruptcy practices very busy.  Katten could have gotten its fair share of that work.

40.    As another example of how the group came to be perceived in the market, in April 2023  I talked with Rose Neale (the general counsel of Sun Country Airlines) at an American Bar Association  conference.  I had been pitching her for business at Sun Country ever since she left Castlelake, her previous employer.  This should have been low-hanging fruit.  Sun Country was giving out a lot of work to outside counsel—including Hughes Hubbard where our former partner Tom Healey is-- in connection with the recent rapid expansion of its aircraft fleet.  But I had gotten none.  I told her at the conference I still hoped to work with her at Sun Country.  Her reply was, "But Stewart, it's just Brett and you."

41.    The other problem with having no personnel to support in the practice group was that I could price my services only as a solo practitioner would. Our competition was no longer Hughes Hubbard, Clifford Chance, Pillsbury

Winthrop, Holland & Knight,   Vedder Price or Milbank, but our former counsel Robyn Mandel, now a solo practitioner.  Clients will pay $1,500 an hour or more only for a partner who has a full transaction team standing behind him.  So not only did we get only smaller transactions, we had to discount our rates. Again, this depressed my collections and income.

42.     What I came to realize was that Heller was deliberately crippling the aircraft-finance practice group and breaching the partnership agreement by systematically and surreptitiously denying Lynes and me the personnel we needed to serve our clients, attract other clients, and meet the collections expectations for partners of the firm.  What I only found out definitively on March 16, 2023 (see discussion below) was that Heller was doing this because Lynes and I were in our 60s, had already practiced nearly 40 years, and were in what he thought should be the end stages of our careers.

43.     Nevertheless, I made heroic efforts to fix this problem on my own. Serendipitously, Christopher Harrison joined the firm as a capital markets partner in Katten's London office in late 2021.  I discovered that at two of his prior law firms, he had been in the aircraft- finance group.  I asked around and found out that tax partner Charlotte Sallabank in London had been an aircraft-finance banker before she became a lawyer, and London bankruptcy partner Sonya Van de Graaff had airline workout experience. With the cooperation of the London managing partner I put together a three-partner, four-associate, two-paralegal ad hoc group in London (where we needed to have boots on the ground anyway because Castlelake had an office there) to

join the aviation team (without taking them away from their primary work). In early 2023, I was finally given access to U.S. corporate department associates. Lynes encouraged me in the London initiative, and I am not sure Heller ever knew about it. In the twelve months before Heller fired me I was successful in integrating the London and U.S. colleagues into our aviation transaction work. By mid-2022, Castlelake was starting to give me portfolio deals again. But Heller deliberately cut me off just as my patient groundwork was bearing fruit.

44.     Let me point out that I am recognized after a long career as one of the leading aircraft finance lawyers in the industry. I was ranked as a "leading lawyer" in the Legal 500 US 2023 rankings for Transport: Aviation and Air Travel- Finance. Additionally, I did an innovative deal in 2022 that was awarded Freighter Finance Deal of the Year by Airline Economics magazine and was even featured prominently on Katten's website right up until the time that Heller fired me. I am a member of the International Registry Advisory Board, a prestigious industry group that writes regulations that govern an international aircraft registry created under a treaty to which 120 countries are parties. In this capacity, in March 2025 I participated in a meeting of the International Civil Aviation Organization, a United Nations agency, as the only private-practice lawyer, in finalizing the latest iteration of these regulations. I have regularly spoken at industry conferences around the world. I wrote numerous client alerts that Katten published on its website and which were also published in legal and trade magazines. In 2024, I was selected by a

consortium of eight insurance companies to act as their expert witness in aircraft leasing in a multibillion-dollar litigation over commercial aircraft stranded in Russia because of the sanctions imposed on Russia for invading Ukraine. I should be running a large team and earning top-of-market compensation.

45.     Despite suffering years of depressed compensation I remained loyal to the firm and hardworking. In 2022 I devoted 2,200 hours to chargeable and business-development time. I had been led to believe that I would be free to rebuild the practice group.

**Heller deceives me at my final annual review but he admits that he gives other practice groups assistance with business development.**

46.     On February 14, 2023, I had what would turn out to be my last annual performance review, before Heller and Katten partner Ronni Davidowitz. I had submitted my self-evaluation memo on January 31, as required of all partners. In the memo, I explained the situation described above (as I had done in previous years). Heller commented at this meeting disingenuously that he had not read the memo because he didn't have time to read all the partners' memos. I then explained the practice group's situation to Heller and Davidowitz. Heller replied that although business-development issues were normally handled within the practice group, he did get involved for any issues that could not be handled there. He said that he would meet with Lynes and me after the time-consuming compensation reviews were over to resolve the

problem. Heller was not being honest. Yes, he helps with business development, but he was not going to give that help to me. He was concealing from me the fact that he had already decided to terminate the aviation practice group.

**Lynes admits to me that Heller is terminating the aviation practice group, forcing Lynes to retire, reassigning Seifarth, and immediately terminating me.**

47.     From March 2 to March 6, 2023, Lynes, Seifarth and I attended ISTAT North America, the major annual U.S. aircraft finance conference, in San Diego.  There we hosted our usual sushi-and-cocktails reception at Nobu for firm clients. I had numerous meals and other meetings with clients and others to discuss pending and potential transactions and to pitch potential clients to hire Katten.  On the morning of my third day back in the office, March 9, 2023, I received an email from Heller's assistant Kelly Vazquez asking that I attend a meeting with Heller and Katten partner and general counsel Michael Verde in the New York office on March 16.  Kelly said the meeting had to be in person and that Zoom was not an option.  (Clearly Heller and Verde had set this up so there would be no recording, thinking that in the event of a dispute, it would come down to the word of Heller and Verde against mine.)

48.     I immediately called Lynes to ask why Heller was calling this meeting. Lynes told me – to my complete shock-- that Heller was terminating the aviation group.  Lynes was apparently not shocked, explaining to me,

"*I should have seen the writing on the wall.*" He said that Heller would deal with the three members of the group unequally, as follows:

•Lynes, then 63 years old, had just entered into a written separation agreement with the firm by which he became a Special Capital Partner (which I explain below) on February 1, 2023, and would remain so until January 31, 2025 at which time he would retire with full pension under the firm's Retirement/Death Benefit Plan and other benefit plans. (The Retirement/Death Benefit Plan is a Top Hat Plan, as declared by the firm in a registration with the U.S. Department of Labor. Section 510 of ERISA bars a sponsor from discriminating against or terminating a participant in a Top Hat Plan in order to keep him from attaining benefits under the plan.)

•Seifarth would remain at the firm indefinitely as a senior associate working on aviation matters until Lynes retired on January 31, 2025. Thereafter he would be reassigned to the structured-finance practice group.

•Heller would terminate me immediately, despite my being close to the firm's normal retirement eligibility age of 62 at which I would become eligible to retire and collect a pension under the firm's Retirement/Death Benefit Plan.

49. Lynes told me that Heller's decision was final and that the only accommodation Heller might give me if I asked would be to keep me on the firm's website briefly. Still shocked, I asked Lynes why he hadn't told me this before the San Diego conference. At this point Lynes suddenly realized that he had already told me too much. His agreement to resign has confidentiality

and nondisparagement provisions that prohibit him from discussing this situation with anyone outside or within the firm, most especially me. As I was still talking, he said, "Listen, I have to go. Bye" and hung up. Lynes never talked to me again.

50.      Katten would later say dishonestly, in its response to the recitation of the above facts in my EEOC complaint, that Lynes had already announced to the firm a year before (i.e. early 2022) that he intended to retire on January 30, 2025. If so, Lynes didn't tell me, and I would be the person most affected. Also, partners retiring in the normal course do not sign agreements to resign. Nor do they tell me the news with, "*I should have seen the writing on the wall.*" Moreover, on one of our regular weekly catchup phone calls, I had asked Tim if he had any plans to retire. He replied that he did not, and that he planned to work for years to come. I specifically remember asking him about this because I had done so shortly after firm chair Roger Furey had sent around an email to partners of a certain age asking them, for purposes of the firm's continuity planning, to think about how long they intended to continue to work. Tim's answer that he was not retiring soon was not surprising because he was not in a financial position to retire. He was supporting two expensive houses, his main residence in DC and a vacation house on the shore in Maryland; he was supporting his elderly mother; and he was paying tuition and living expenses for a daughter who had just started law school.

**Katten Muchin Rosenman LLP Retirement/Death Benefit Plan**

51.     Since I joined Katten in December 2013, I made regular contributions to the Katten Muchin Rosenman LLP Retirement/Death Benefit Plan (the "Retirement/Death Benefit Plan").  The Retirement/Death Benefit Plan is a defined-benefit pension plan.  All partners are required to participate.  Under the Retirement/Death Benefit Plan, I could have retired on or after my birthday in 2024 and collected a pension payable monthly of $140,000 per year for ten years.  For every year I delayed retirement beyond 2024 until I accrued 20 years as a partner, the pension would have grown, to a maximum of $240,000 per year.

52.     The contributions by the partners to the Pension Plan were invested, but no partner had an account or ownership of those investments.  Payments to the retired partners constituted general unsecured general obligations of the firm. If the partner departed the firm before becoming eligible to collect payments under the Pension Plan, the partner's payments would be returned to him without interest or other claim on investment profits.

53.   In 2022, Katten experienced a downturn in revenue, which in August 2023 led to layoffs by Katten as reported in the legal press at the time.  To control expenses, Katten had a strong commercial incentive not to let a partner retire and collect his pension.  If the partner departed, the firm would be required to return the partner's contributions to the Pension Plan.  In my case, that was approximately $180,000.  But in exchange, the firm would avoid an aggregate payment obligation to that partner of $1,400,000 to $2,800,000.

**Special Capital Partner**

54.    Special Capital Partner is a category provided for in Section 7.4 of the firm's partnership agreement.  It is a subset of Capital Partners that is paid less than regular Capital Partners.   Special Capital Partner can be a transition status for Capital Partners nearing retirement age but also can be a temporary status for Capital Partners whose revenue has temporarily declined for whatever reason.  There is no time limit to remaining a Special Capital Partner and Special Capital Partners who do not retire can resume being regular Capital Partners at the appropriate time. Because Special Capital Partners are still Capital Partners, they continue to participate in the Retirement/Death Benefit Plan, which is open only to Capital Partners. Therefore Special Capital Partners can remain at the firm and receive compensation that is economic for the firm, without having their pension benefits interrupted.  As I discuss below, by making me a Special Capital Partner rather than terminating me, Heller could have kept the aviation practice going or redeployed me to another practice group in a way that would clearly have been commercially viable to the firm.

**My email to Heller and Verde on March 16 before my meeting with them on that day.**

55.    Early in the morning of March 16, 2023 I sent an email to Heller and Verde.  I explained that Lynes had told me that Heller and Verde were calling the meeting to fire me, which I understood  meant they were just planning to

read a termination script to me.  I asked to discuss being redeployed to another practice group as a Special Capital Partner in lieu of being terminated.  I also pointed out that terminating me just before I would become eligible to retire with my pension under the Retirement/Death Benefit Plan and reassigning 40-year old Seifarth but not 60-year-old me to another practice group would constitute discrimination under ERISA and federal and state age-discrimination law.  Heller replied to acknowledge receiving my email.

**Heller and Verde meet with me to pressure me to resign from the firm and waive my discrimination claims.**

56.    On March 16 I met with Heller and Verde as scheduled.  Heller and Verde are each about six feet eight inches tall, and are built like basketball centers, rawboned and intimidating.  Heller has a deep booming voice and shaved head. Before Verde became a lawyer, he was a detective in the New York City Police Department.

57.    The room they selected for the meeting was a small conference room on the sixth floor of the firm's offices at 50 Rockefeller Plaza. The conference room had a large plate-glass floor-to-ceiling window separating it from the hallway.  It felt like an interrogation room.  They seated me on one side of the table, near the plate-glass window, and took their places on two other sides, directly facing me and sitting four feet away from me.

58.    Forty lawyers and twenty secretaries work on that floor.  The conference room was just off the elevator lobby, in a heavily trafficked area.

31

People walking by could look in and figure out what was happening to me. The setting was meant to embarrass and humiliate me in front of my colleagues, and break my spirit.

59.     Heller started off by saying that it was correct that he was terminating the aviation practice group.  He said  this decision was final, and that he would not discuss Lynes or Seifarth.  He said that I would have to depart the firm and this too was his final decision.   He said that I had two choices: (i) agree to resign from the firm by a date within a few months or (ii) be fired. I expressed my objection to this state of affairs and said that it appeared Heller was discriminating against me because of my age and to keep me from getting my pension under the Retirement/Death Benefit Plan.  He replied by saying that the following day I would receive an agreement to resign the firm had already prepared which would state that I would resign from the firm no later than September 30, 2023; receive reduced pay until then; be removed from the firm's email, phone and word processing systems immediately; wind down my work immediately and not start any new matters; and immediately waive all  claims  against  the  firm  including  under  federal  and  state anti-discrimination law and for any breaches of the partnership agreement.

60.     Heller's scheduling the meeting for March 16 was no accident.  That date is just days before the time each year that Heller determines partners' annual discretionary bonuses.  For each partner, at the time Heller determines the bonus, if any, he may also weaponize a provision set forth in Section 12.7

of the partnership agreement that allows him to retroactively claw back up to 20% of the partner's compensation for the fiscal year just ended.

61.    At the meeting, Heller tried to coerce me to sign the agreement to resign quickly, despite my legal right under the Older Workers Benefits Protection Act (which is part of the federal Age Discrimination in Employment Act) to 21 days to freely consider it.  Heller told me that if I did not sign the agreement before the time he determined bonuses, he would impose on me the maximum clawback of  20% ($226,900) of my annual compensation. He said that if I did sign, there would be no clawback at all. Because this penalty would be reflected in my final distribution for the fiscal year just ended to be made in early April 2023, this penalty would deprive me of the cash that partners are intended to receive to pay annual and quarterly income taxes, pension contributions and capital loan repayments.  Heller and Verde clearly expected this coercion to work.  Before the March 16 meeting, as shown in an email from Katten Conflicts Attorney Alina Antounian, Verde had directed her to put a new matter request I had submitted (for new client Mirati Therapeutics) "on hold", telling her that he expected to know more "next week."  That clearly shows that Verde intended to coerce me into signing the agreement to resign immediately, in violation of the ADEA.

**Heller and Verde tell me that because I am getting close to retirement age, it would be risky for the firm to let me keep handling client matters.**

62.     The next part of the meeting is crucial to my claim of age discrimination and intentionally depriving me of my pension.  At this point in the meeting, Heller said things to me that confirmed that he was terminating the practice group, forcing Lynes to retire, and terminating me, because of our advancing ages, which he viewed as putting us well into the end stages of our careers.  Heller essentially said that I was no longer capable of running a practice because of my age. He told me that the most viable career option for me at this point in my career would be to work at another firm in a non-revenue-generating role mentoring younger lawyers, *_because he had just hired a 70-year-old and a 73-year-old at Katten to do just that._*  I did not even know who he was talking about.  Later I figured out that he was referring to Elliot Lauer and Jacques Semmelman.  Lauer and Semmelman used to work at another law firm, Curtis-Mallet, with Steven Reisman, a bankruptcy partner at Katten who is favored by Heller.  Whatever happened to Lauer and Semmelman at Curtis-Mallet, Heller hired them to act as mentors and elder statesmen in the litigation department of Katten as a favor to Reisman.  Only younger lawyers in the litigation department would have client contact, however.

63.     Frustrated at what Heller was saying, I again pointed out that the problem was not my age.  It was that we did not have enough people in the practice group to retain our existing clients or attract new ones, or to do large transactions.  I told them I had shown this was the problem by the success I was having with my ad-hoc group of London-office lawyers; that I was still

doing award-winning work (featured on Katten's on website); and that even with these problems I was still bringing in revenue of over $1 million per year. (Notably, Katten said in the Position Statement it later submitted to the EEOC that the reason it brought me in as a partner is that I had promised revenue of at least $1 million per year, which now was suddenly not enough.)  I also again pointed out that Heller was terminating me suspiciously close to the date on which I would first be able to retire from the firm if I wanted to and start collecting my defined-benefit pension under the Retirement/Death Benefit Plan.  I said that  I was nevertheless not ready to retire.   Trying to reach common ground, I told Heller that if he still insisted on making what I viewed as a bad business decision to terminate the practice group, and breaching the promise he made to me when the firm hired me that I would be part of a robust practice group, I would be glad to apply my considerable skills set to work with other practice groups.  This is just as he was planning to redeploy Brett Seifarth to work with the structured finance group, which even has clients such as the ratings firm DBRS Morningstar that get involved in aircraft finance matters.

64.     Brett too has practiced aviation finance his whole career.  He has the same skills set as I do, except that mine is broader and more advanced because of my greater experience.  I had an unblemished record at Katten and always received excellent annual performance reviews.  By contrast, Seifarth's annual reviews do show performance issues, to such an extent that he was actually denied his annual step increase in pay at one point.  I had worked for 36 years

on structured finance, commercial finance, bankruptcy, litigation, and corporate matters, for which the firm has thriving practices apart from aviation. Many of our colleagues work across related practice groups. In fact, in December 2022, I had worked with Katten health-care practice head Laura Martin on the merger of two Chicago-area hospital systems. My role was to draft a very complicated escrow agreement for the payment of the purchase price in several stages at closing. I was able to do that, even though the transaction had nothing to do with aviation, because I had been drafting escrow agreements for 36 years in all my aviation transactions. Similarly, in 36 years I worked on many domestic and foreign airline bankruptcies and restructurings, and acquired the skills set to handle similar matters in any other industry. That skills set made me well suited to work with Katten's large bankruptcy practice group.

65.     I even offered to take Special Capital Partner status, which would have allowed the firm to pay me less while keeping me in the Retirement/Death Benefit Plan. ("Of Counsel" and "Non-Capital Partner" are two other alternatives provided for in the partnership agreement.) Heller replied that the firm would not let me transition to another practice group. Verde followed up. Verde told me candidly that the reason the firm would not redeploy me was my age. He said that as general counsel of the firm, he has regular discussions with the firm's malpractice insurer about how to mitigate the risk of malpractice claims against the firm. Verde said that based on its experience with claims involving other firms, the malpractice insurer had told Verde that

it is risky to let partners continue to work on client matters when they are at a later stage of their career and eligible for retirement or nearing eligibility. The reason is that they are more likely to make mistakes that will result in malpractice claims against the firm. These lawyers start not to care any longer about doing careful work. They think that by the time their mistakes are discovered and the firm is sued for malpractice, they will already have retired and not have to face the consequences of their mistakes. So, Verde said, rather than try to integrate me into another practice group, where I would not even care about the clients because they were not my own, it would be better for the firm just to have me exit as soon as possible.

66. By contrast, 40-year-old Brett Seifarth did not present this risk. He would be expected to work another twenty years or longer. He would still care about doing careful work because he needed to protect the next twenty years of his career at the firm. I have an exemplary record of doing excellent work for clients throughout my career. For Katten to say I am not able to do that anymore because of my age constitutes discriminatory treatment of me by Katten because of my age. It is illegal.

67. Katten's firing me because of my age was part of a pattern. At the same time (August 2023) that Heller fired me, he dealt with a slowdown in other practice areas by redeploying younger lawyers to other practice groups and terminating older lawyers. Katten did this by its own admission. In a

statement published in an article in the ABA Journal on August 2, 2023, Katten said:

*Katten Muchin Rosenman has confirmed that it is "parting ways with a small number of our attorneys and business support professionals."*

*In a statement provided to the ABA Journal, the law firm said many clients are facing a challenging environment because of "rapidly shifting economic conditions." The result has been a decrease in demand for some legal services.*

*"After working through these conditions for some time and a careful review of our business, we made the difficult decision to address this overcapacity," the statement said. "**Where possible, we reassigned team members to practice groups where demand exceeds capacity** [ital. added], and our reductions were limited to groups where existing and expected demand is diminished."...*

*"Parting with talented colleagues and good friends is not easy," the statement said. "Our actions are not a negative reflection on our colleagues or their contributions to our firm. Rather, the decision reflects the reality of the business environment in which we find ourselves **and our commitment to continually provide development opportunities that allow our people to grow** [ital. added]. While difficult, we believe our decision will keep the firm strong and well prepared to serve our clients and our people."*

Katten reassigned lawyers to other practice groups "where possible" "to continually provide development opportunities that allow our people to grow"

to "keep the firm strong." This is code. It means that Katten used a downturn in business as a pretext to clear out older lawyers with excellent transferable skills sets because as long as they were working on matters, younger lawyers couldn't get the experience they needed to grow and develop and serve clients in the future. This is rank age discrimination.

68. The March 16 meeting was not the first time Heller had expressed to me his bias against older lawyers nearing retirement. In 2013, Heller interviewed me as part of the process of recruiting me to come to Katten. During the interview, he actually *boasted* about stereotyping his partners in their 60s. He explained how he had won the position of Chief Executive Officer of the firm only a few months earlier at the age of 37 . He said that he had done that by convincing the partnership that the older candidates for CEO would be concerned only about retiring in a few years and would therefore not act in the firm's long-term interest.

69. In fact, during the time that Heller fired me, race, age and sex discrimination had become the *official policy* of Katten. On June 9, 2020, in response to the death of George Floyd and the civil unrest in New York that resulted in vandalism to the firm's New York office building, the firm held a Virtual Town Hall Meeting for all Katten personnel. During this meeting, firm Chairman Roger Furey pledged to be an "anti-racist." On June 22, 2020, the firm's Diversity Committee followed up by sending all Katten personnel a "Diversity and Inclusion Update." The Update encouraged all Katten personnel to be "anti-racist" and stated, "*Being anti-racist is a conscious*

*decision to make frequent, consistent and equitable choices daily and requires education.*" The education the Update recommended to guide those conscious choices included Ibram X. Kendi's *How to Be an Antiracist*.  In this book Kendi wrote that being anti-racist requires doing the following: " "The only remedy to past discrimination is **present discrimination** (ital. added). The only remedy to present discrimination is future discrimination."  At the bottom of this Update endorsing it were the names and photos of the Diversity Committee Members including Heller.  A list of materials including this book was placed on the Katten intranet.

70. This official policy was not just theoretical.  There were many examples at Katten of open, active, official discrimination:

➢The firm set up a "Black Attorneys Affinity Group."  According to the firm's intranet, "*This group is open to our Black attorneys at Katten*…"  Other firms open membership in affinity groups to "allies."  Not Katten.

➢Similarly, the Committee for Racial and Ethnic Diversity and the Partner Collective on Racial and Ethnic Diversity forbids membership by whites.

➢The LGBTQ+ Coalition forbids membership by the heteronormative cisgendered.

➢The "Katalyst Sponsorship Program" is a client development workshop open only to minority and female lawyers.

➢At the Katten partner retreat in Phoenix in October 2022, the firm held a reception for minority partners. Every partner was invited, unless that partner was white, male and straight.

➢The firm's Biennial Diverse Attorneys Leadership Summit invites every Katten lawyer for professional development and networking, unless that lawyer is white and straight.

➢In order to know whom to discriminate against, the firm even maintained an official list of minority lawyers on its intranet.

71.    The anti-racism soon veered into pressure to be a left-wing activist, creating a hostile and threatening work environment. On June 1, 2023, the Diversity, Equity and Inclusion Team, which included Heller, sent an email to all Katten personnel including the following, *"We are seeing an alarming rise in the number of anti-LGBTQ+ legislation proposed and promulgated across the country, and an unprecedented effort to curtail LGBTQ+ rights...Now is the time for collective education and action, and we hope you join us in this effort."* When the Chief Executive Officer sends out an official Katten email saying "we hope you join us in this effort", that is a message that when he makes decisions on compensation, promotion and termination, he will remember who actually has joined him in that effort.

**The agreement to resign required that I waive my rights under age-discrimination law, and provided a penalty of $226,900 if I didn't sign it immediately.**

72.     On March 17, Katten partner and Deputy General Counsel Brooks Giles emailed me the agreement to resign.  As Heller had told me the day before, under this agreement I would immediately agree to resign from the firm no later than September 30, 2023 and give up my defined-benefit pension under the Retirement/Death Benefit Plan.  I would specifically acknowledge that I would thereafter no longer be entitled to participate in the firm's medical, dental, life insurance, or disability insurance plans; the firm's cash-balance retirement plan; the firm's 401(k) plan; or the Retirement/Death Benefit Plan.  The agreement provided that I would immediately waive any claims I had against the firm or any of its partners for violation of the Age Discrimination in Employment Act, ERISA, any other federal, state or local anti-discrimination law, any claims for breach of the partnership agreement, and any other claims whatsoever.  It provided that if I filed any such claim, I would forfeit my 401(k) and cash-balance-plan accounts, which was surprising (and a violation of ERISA), because they are vested from day one. It provided that I could not work on any new matters and had to immediately turn over all my work to other lawyers at Katten.  It provided that I would be immediately cut off from the firm's email and word-processing systems.  This last provision was designed to ensure that I would in fact resign as soon as possible, and much earlier than even September 30.  If I stayed cut off from my clients for six months, they would have long since sent their work to other law firms.  Finally, the agreement provided that if I did not promptly sign it, Heller would claw back $226,900 of my prior year's pay.

**Heller imposes a financial penalty of $226,900 on me for refusing to sign the agreement to resign and waive my ADEA, ERISA and other claims before the OWBPA- mandated 21-day waiting period is over.**

73.     The agreement to resign required that I waive my rights against the firm including any claims under the ADEA.  The Older Workers Benefit Protection Act (OWBPA), an amendment to the ADEA, required that the firm give me 21 days to freely consider an agreement in which I would be waiving the protections of the ADEA.  But the terms of the agreement to resign and the timing of when it was presented to me were intended by Heller to force me to accept it immediately, on retroactive penalty of 20 percent ($226,900) of my annual compensation and the cash needed to pay my April 2023 taxes, pension contributions and capital loan repayment.  When I did not accept the agreement to resign in a few days (as I discuss further in the next section), Heller imposed this penalty.  The firm applied this penalty in two ways: (i) it eliminated my mid-April distribution and (ii) since that amount was smaller than the penalty, the firm sent me a bill for me to repay the firm the rest ($51,000).     As Heller knew, the purpose of the mid-April distribution is to provide partners cash to make their final income tax payments on April 15 for the prior calendar year and quarterly estimated taxes.  Heller retaliated against me harshly for declining to sign the agreement to resign by depriving me of the cash that I needed to pay the Internal Revenue Service and State of New Jersey on April 15, 2023 for my 2022 taxes and 2023 first-quarter estimated taxes, causing me to not be able to make the payment by the deadline and

incur interest and penalty expenses imposed by the IRS and the State of New Jersey.

74.    Needless to say, being in trouble with the IRS, the prospect of losing my livelihood with my having a wife and children to support and a mortgage to pay, and the prospect of having to apply for a job in my 60s, caused me– and my wife– extreme emotional distress.  Since Lynes told me the news on March 9, 2023 to the present day, I am plagued with constant anxiety.  I rarely sleep more than four or five hours, and usually wake up around 3 a.m. from a work-related nightmare.  Before Heller fired me, it filled me with dread to check my office email or answer my office phone, knowing that it could be Verde calling to tell me how upset Heller was that I hadn't resigned yet.  This is well documented in my medical records.  I discussed my anxiety with my primary-case physician, Dr. Lauren Im-Imamura of Summit Health in Florham Park, New Jersey.  She told me she was very limited in what she could do for me while the source of the anxiety was still there, and told me to contact her immediately if I had thoughts of self-harm.

**Heller and Verde conduct a campaign to try to coerce me into resigning and waiving my rights against the firm and retaliate against me for refusing to do so.**

75.    Katten argued to the EEOC in Katten's Position Statement that it fired me for legitimate business reasons and within its rights under the partnership agreement.  If this were true, Heller would have said to me – but did <u>not</u> say–

at the March 16 meeting: he was firing me with two weeks' notice because he was terminating the practice group, under the partnership agreement he had the right to fire me at any time with or without cause, but that if I immediately signed an agreement waiving my rights against the firm, the firm would be nice enough to pay me six months' severance on March 30 to tide me over until I found another job.

76.     Heller did not do any of that, because the last thing in the world that he wanted to do was fire me.  Because I had told him in writing that if he did, I would file an age-discrimination complaint with the EEOC and a complaint for a breach of Section 510 of ERISA (for firing me to deprive me of my defined-benefit pension) with the Employee Benefit Security Administration of the U.S. Department of Labor.  Heller wanted instead to force me to resign and waive my rights.  So Heller and Verde conducted a relentless campaign to harass me, lie to me, coerce me to into resigning, and retaliate against me for raising my discrimination claims and refusing to resign and waive my rights. Their actions constituted further violations of the ADEA and ERISA.

77.     As the Older Workers Benefits Protection Act (OWBPA) requires for waivers of discrimination claims, the agreement to resign stated that I would have 21 days to freely consider this agreement and seek the advice of counsel if I wanted it.  The end of the 21-day period would be April 8.  After I received the agreement to resign, Verde, copying Heller, sent me an own email.  In his email, Verde said that although I had until April 8 to decide whether to sign the agreement under the OWBPA, I would have only until

April 1 to sign it if I wished to avoid the retroactive clawback of my pay in the amount of $226,900. (Notably, Verde's acknowledgment that I was entitled to the 21-day period means he acknowledged that I am covered by the ADEA, and all antidiscrimination law, despite being a partner.) This is a violation of the OWBPA. An employer is not allowed to threaten or impose a financial penalty on a worker for refusing to sign a waiver of rights earlier than the end of the 21-day period.

78.    On March 21, Heller, copying Verde, sent me an email, accelerating my decision date to that day: "*Stewart—we are meeting today to finalize capital partner compensation. Further to our conversation, let me know if you intend to sign this letter. Otherwise, we will consider a reduction to your target for the purposes of your compensation.*"

79.    So what started out as the 21-day consideration period required by the OWBPA was first shortened by Verde from April 8 to April 1, and then by Heller from April 1 to March 21, only four days after Giles had sent me the agreement to resign on March 17.

80.    On March 21, I replied to Heller, copying Verde, saying I would not be coerced into resigning from the firm, that he was violating the OWBPA, and that the statements Verde and he had made to me in the March 16 meeting showed he was discriminating against me because of my age and to deprive me of my pension. I further said that if Heller fired me or otherwise changed

my status at the firm, I would immediately file complaints with the EEOC, the New York State Division of Human Rights, and EBSA.

81.    On March 22, Heller, copying Verde, replied by email.  His tone now changed from civility to anger.  He denounced me for "clearly creating a record" for litigation.

On March 22 and thereafter, Verde, copying Heller, sent me emails in which Verde browbeated me and made false statements about my legal rights, in the same manner he must have dealt with criminals when he was a police detective:

➢Verde called me "unhinged" among other taunts and insults.

➢Verde called the assertion of my ERISA, ADEA, and state-law discrimination claims "baseless threats" and "personal attacks" and said I was being "counter-productive" and I was not entitled to "special treatment."

➢Verde told me, *"...you are going to make a fairly straightforward and even amicable process much harder than it needs to be.  I don't think that is in your interest."*

➢Verde falsely told me that the ADEA did not apply to me even though the agreement to resign that Verde himself had drafted recited that I was entitled to the benefit of the ADEA.

➢Verde falsely told me that Katten's Retirement/Death Benefit Plan (the defined- benefit pension plan) was not covered by ERISA's anti-discrimination rules because it was not subject to ERISA at all:

*"Regarding ERISA, only Capital Partners such as yourself participate in the Nonqualified Retirement Plan [the Retirement/Death Benefit Plan]. This is a non-tax-qualified deferred compensation arrangement, not a pension plan, and no employees participate in this Plan. As such, the Nonqualified Retirement Plan is not subject to ERISA, and none of your threatened claims under ERISA have any merit."*

However, on August 11, 2023, exactly one week after Heller fired me, Katten filed a Top Hat Plan Statement with the Employee Benefit Security Administration admitting that the Retirement/Death Benefit Plan may very well be subject to ERISA.

➢Verde falsely told me that although the firm's 401(k) and medical/dental/life insurance plans are covered by ERISA, partners are not entitled to ERISA protection for those plans. He later admitted in writing to EBSA that partners are so entitled. (The US Supreme Court ruled in 2002 that if an ERISA plan includes owners and employees, the owners are covered just as much as the employees.)

➢Verde falsely told me that Katten's partner-only Cash Balance Plan was not subject to ERISA, even though every year Katten filed its required audit of the plan on Form 5500 with EBSA in which Katten certified that such plan was

subject to ERISA and had sent every partner a Summary Plan Description stating that the plan was subject to ERISA.

In an email, Verde said *"...the Cash Balance Pension Plan is limited to Capital Partners and has no employee participants, and so is similarly not subject to ERISA, again nullifying your threatened ERISA claims."*

And yet the Summary Plan Description provided by the firm to every participant stated, *"As a participant in the Plan, you are entitled to certain rights and protections under ERISA."*

Similarly, the annual report on Form 5500 provided, *"The Plan is a defined benefit pension plan covering U.S.-based capital partners of the Firm. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended (ERISA)."*

82.    The making of false statements about a beneficiary's rights under ERISA plans by a plan fiduciary such as Verde is also illegal: it is prohibited under ERISA Section 404.    The making of false statements to induce a plan beneficiary to give up ERISA protected rights also constitutes criminal fraud under ERISA Section 511.  Discriminating against a plan beneficiary violates ERISA Section 510.

**Compensation Meeting**

83.    On March 28, as a followup to my annual review on February 14, I was summoned to a meeting in a conference room in the New York office to

announce my final compensation for the fiscal year just ended. Heller and Ronni Davidowitz were again present. The meeting lasted 90 seconds. Heller was visibly angry and rude, in a way that I had never before seen in 36 years of practice. When I walked in, I congratulated Ronni for bringing on Parker Taylor, the new partner in the Private Wealth practice (which she heads) who had started at the firm that morning. Ronni started to tell me what a good addition he would be to her practice group. Heller cut her off in mid-sentence. He announced that he was indeed imposing the $226,900 penalty on me retroactively. After he gave me that news, instead of giving me the customary opportunity to ask questions, he glared at me and said, "That's all", with a tone that meant "Get out of this room now." I walked out embarrassed and humiliated. Even Ronni seemed shocked to see him treat me this way. She can confirm to you what happened at this meeting. That would be the last time I ever saw Heller.

**Verde retaliates against me for refusing to resign by creating a hostile work environment, depriving me of the privileges of partnership, and intentionally inflicting emotional distress, in order to squeeze me out of the firm.**

84.     Verde retaliated against me, in breach of ERISA, the ADEA, and the New York State Human Rights Law, for refusing to resign and waive my rights against the firm, by creating a hostile work environment and depriving me of my rights as a partner, badgering me to try to get me to resign and

waive my rights, and intentionally inflicting emotional distress on me, as follows:

➢As discussed above, in his emails to me, copying Heller, Verde called me "unhinged", and otherwise mocked, insulted and menaced me.

➢Verde directed Lynes to tell the Katten marketing-department employee who handled the aviation practice group (Jessica Walter) that I would not attend and speak at an upcoming aviation conference despite my interest in going and history of attending and speaking at conferences as an important marketing tool.  He did this to keep me from representing publicly that I was still a partner at Katten.

➢Verde directed Katten Conflicts Attorney Alina Antounian not to allow me to open any matter for my new client Mirati Therapeutics, causing that client to seek other counsel.  He did this to shut off my client relationships.

➢Verde pressured me to look for another job, and when I did look, harassed me for failing to get an offer on an artificially short timeframe dictated by him,  knowing that it would be hard for a partner in his 60s to find any other employment at all.

➢On May 11, Verde harangued me over the phone that Heller was upset at how much I was still getting paid and that I had not yet agreed to resign from the firm.

➢Verde repeatedly reminded me that Heller had the power to crush me whenever he wanted, emailing me such things as: "Keep in mind that the Firm could have expelled you at any time."

➢On May 25, Verde called to remind me that he had succeeded in getting every other partner whom Heller wanted out of the firm to resign.

➢On June 15, Verde directed Lynes not to allow me to open any matter for another new client I tried to bring in, the airline Royal Air Maroc, causing that client to seek other counsel. Lynes told me in an email that it would not be prudent to let me take on any new clients because I was departing the firm soon.

**Second Agreement to Resign**

85.     On May 30, 2023, Katten Deputy General Counsel Brooks Giles emailed me a revised agreement to resign. This draft provided that I would resign by no later than December 7, 2024 and immediately waive my claims against the firm. There were several problems with this agreement. The main problem was that I was still not going to agree to resign and end my career ten years early because Heller, Verde, or the firm's malpractice insurers thought it was too risky to allow lawyers getting close to retirement to continue to handle client matters.    Second, the agreement required that I take an immediate pay cut of over 75%. The cut was so drastic that after deducting mandatory health insurance premiums (of over $3,600 per month), mandatory pension contributions, and mandatory state-tax withholding payments (for

New York, Illinois, and California), my take-home pay would actually be negative. Not only would I be working for nothing with no money to pay bills or federal or New Jersey income taxes, the longer I worked under this arrangement, the larger my debt to Katten –and the Internal Revenue Service and State of New Jersey– would be. Also, the agreement to resign recited that it was still subject to all of the terms of the partnership agreement including the right of Heller to terminate me at any time before December 7, 2024 with or without cause. So Heller could still fire me the day after I signed the agreement, in which case my waiver of rights against the firm would still be effective. In one email to Heller and Verde I pointed out this feature, and they did not deny it. Therefore I viewed this agreement as wholly unsatisfactory and really an attempt to trick me into waiving my rights, which was Heller's goal all along. I notified Heller and Verde of these points and told them this agreement was not acceptable.

**Heller and Verde deny my request for mediation and arbitration, in violation of the firm's partnership agreement.**

86.    Section 20 of the firm's partnership agreement requires that if the firm and one of its partners have any dispute, they will retain a mediator to try to resolve that dispute, and if that effort is not successful, the parties will go to arbitration. On June 27, 2023, I emailed Heller and Verde saying that the second agreement to resign was not acceptable for the reasons I gave above. I invoked Section 20 of the partnership agreement, asking to go to mediation and if necessary arbitration. In that situation, the firm is obligated under the

partnership agreement to go to mediation and then arbitration. (Note that the arbitration provision does not prevent me from filing a complaint with the EEOC or any other agency, and does not block the agency from pursuing the complaint against Katten.) Section 20 requires that if a partner asks for mediation, he must at the same time make an initial offer for settlement, in order to facilitate the discussion. I did this. My offer, to be raised with the mediator or arbitrator, was preferably to stay in my job –because Katten had no right to fire me for age discrimination and to deprive me of my pension– or if Katten insisted on getting rid of me, to accept a settlement payment based on my expected future compensation. This did not even include damages for pain and suffering for my emotional distress. To value those damages, how much would someone have to pay you to agree to live even a single day in constant anxiety as I have? To suffer the dread that at any time you could get an email firing you without warning? To be afraid to go to bed because you knew you would just wake up at 3 a.m. with a nightmare? Multiply that number by all of the days that have elapsed since March 9, 2023. In any event, this was the process required by the partnership agreement. Heller and Verde would have the opportunity to make their case to the mediator, or eventually an arbitrator. Katten would have the chance to argue that it had the right to terminate me under the partnership agreement and that it was doing so without discriminating against me, and did not have to pay me anything. I ran the risk that an arbitrator would agree with Katten, and that the arbitrator's decision would be binding on me. Also, there was plenty of time to do a mediation and arbitration. Heller wanted to terminate the practice group

effective January 31, 2025, the date on which Lynes agreed to retire.  If an arbitrator agreed with Katten, then the firm could make me depart well before that date.

87.     On July 11, Verde, copying Heller, replied to me by email saying the firm would not do mediation or arbitration.  This was simply a breach by Heller, Verde and the firm of the partnership agreement.  Heller's view was he can do whatever he wants to any lawyer in the firm,  he is not defending his actions before any mediator or arbitrator, he has given me the choice to resign or be fired, and the only parts of the partnership agreement he has to comply with are the ones he likes (i.e. the power to fire a partner).

**Without notice Heller again retaliates against me for my refusing to resign and waive my discrimination claims against the firm, this time by suspending me without pay in violation of the firm's partnership agreement.**

88.     Katten partners are paid once a month, on the first day of the month.  Katten makes this payment by direct deposit to the partner's bank account.  In my case, the payments hit my bank account around 7:30 a.m. on the payment date.  In turn, I had several large payments, including on my home mortgage, to make on the first of the month, by a direct debit from my bank account.  On August 1, 2023, my wife logged on to our JPMorgan Chase account at 7:30 a.m. to confirm the August pay had come in, as she had always done the first of every month.  It had not.  She checked again and again but nothing had

arrived.  By 9 a.m. I suspected something serious was happening and emailed Katten's Chief Financial Officer copying Heller.  Heller replied that he had suspended me without pay that day effective immediately.  He suspended me in violation of the partnership agreement, which permits suspension of partners only "for cause."  Needless to say, refusing to resign and waive my discrimination claims is not "cause."  And he did it in an especially vicious way.  He elected to suspend me on a monthly payday, putting me in default on my mortgage.  But that was not the end of what Heller would do to me on that day.

**Heller retaliates against me by suddenly cutting me off from the firm telephone, email, and word-processing systems, jeopardizing pending deals for a major client and violating New York Rules of Professional Conduct for lawyers.**

89.     At 11:15 a.m. on August 1, Katten's IT department, acting at the direction of Heller, terminated my access to the firm's email, word processing and telephone systems.  At that time, as I was sending emails for transactions worth $100 million closing within days –which Heller knew was for my most important client Castlelake– my screen suddenly went blue and gave me a message that I was no longer an authorized user. I had no idea what was going on.  Allison Koschnick, my longtime contact at Castlelake with whom I was working on these transactions, and who had been emailing me all morning, all of a sudden got bounceback messages saying that I was not available.  Confused and panicked, she repeatedly tried calling me but could not get

through.  She then called the trainee solicitor in Katten's London office with whom I had been working on this transactions. The trainee said she thought I was available because she had just talked to me.  Allison later reached me on my cell and told me twice, in the space of ten minutes, that her boss, aviation general counsel Jeanette Delehanty, and she were "shocked." A loyal client that over ten years had paid millions of dollars in fees to Katten, Castlelake was outraged that Katten would jeopardize $100 million in deals and embarrass Castlelake in front of its counterparties.  In one moment Heller had maliciously ended a client relationship I had spent 20 years building.  He also ended my career in commercial aviation, because without portable business, I could not attract the interest of any other aircraft finance practice group at any other firm to hire me. Also, such action by Heller constituted a violation by him of the following mandatory New York State Rules of Professional Conduct for lawyers:

- <u>Rule 1.3 (*Diligence*)</u>.   Rule 1.3 requires that lawyers "act with reasonable diligence and promptness in representing a client", "not neglect a legal matter", and "not intentionally fail to carry out a contract of employment" with a client.

- <u>Rule 1.4 (*Communication*)</u>.   Rule 1.4 requires that lawyers "keep the client reasonably informed about the status of the matter."

- <u>Rule 5.1 (*Responsibilities of Law Firms, Partners, Managers, and Supervisory Lawyers*)</u>.   Rule 5.1(c) provides that "a law firm shall ensure that the work of partners and associates is adequately

supervised, as appropriate."  (Cutting me off from the firm systems left me unable to contact a first-year New York associate who was working with me.)

- Rule 5.3 (*Lawyer's Responsibility for Conduct of Nonlawyers*).  Rule 5.3 provides that "a law firm shall ensure that the work of nonlawyers who work for the firm is adequately supervised, as appropriate." (Cutting me off from the firm systems left me unable to contact the trainee solicitor in London, who was not yet a lawyer.)

Also, Rule 8.4 (*Misconduct*) provides that "a lawyer or law firm shall not" "(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another."  Heller and Verde acted in concert, individually and on behalf of Katten, to breach the Rules as discussed above.  Rule 8.4 also provides that a lawyer and firm shall not "(b) engage in illegal conduct that adversely reflects on the lawyer's honesty, trustworthiness or fitness as a lawyer" or "(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation." In violation of ERISA and the ADEA, Verde acting at Heller's direction intentionally told me the falsehood that I am not protected by those statutes in order to induce me fraudulently to resign from the firm and waive my claims under those statutes.

**Heller retaliates against me for filing my claim with the EEOC, NYSDHR and EBSA by firing me the next day.**

90.     On August 2, Heller emailed me to tell me that because of my emails, he never again wanted to see me anywhere near the office or him.  I told him that as I promised, I was now going to file my complaints with the applicable agencies.   On August 2 and 3, I filed my complaints with the EEOC, NYSDHR, and EBSA.    I emailed Heller and Verde telling them I had done so.

91.     In response, one day later, on August 4, Heller notified me he was firing me effective 4 p.m. that day, without severance.  The firm's partnership agreement does not give Heller the unilateral power to terminate, fire, or expel partners. Section 11.7.2.9 requires authorization by the executive committee following a joint recommendation of the chief executive officer and the chairman of the firm.   When he notified me he was firing me, I emailed him demanding to see the joint recommendation of the chairman and chief executive officer and the authorization from the executive committee.   He ignored my request, meaning that in breach of the partnership agreement he never obtained the approval of the chairman or the executive committee to fire me.  Without those authorizations he lacked the power (let alone the right) to expel me, his purported termination of me was not valid, and in fact this Court should find that I was not actually expelled from the firm at all.

**Heller and Verde's conduct is at all times knowing, premeditated, and calculating.**

92.    Heller and Verde's conduct was at all times knowing, premeditated, and calculating:

➢Knowing. Let me again point out that Verde is the longtime general counsel of one of a major national law firm. He is assisted by several Deputy General Counsels including Kate Saracene, the head of Katten's large labor and employment law practice, and Julie Gottshall and Stacey Knight, two other partners in that practice.  He knows exactly what the law is.

➢Premeditated. Heller and Verde never said or did anything that they had not thought through. The March 16 meeting was planned well in advance.  Their answers to my emails came after they consulted with one another and their employment-law colleagues.  They said nothing off-the-cuff or by accident.

➢Calculating.  Heller and Verde did not care what laws they broke, or what provisions of the partnership agreement they ignored.  Their method of operation was to do what they want and convince the affected partner to resign and waive his rights, based on the provision in the partnership that gave the firm the power to expel a partner any time.  Once the partner signed the waiver, it did not matter what they had done to him.   In fact, Verde had told me that I was the only partner that Heller wanted to force out who would not sign an agreement to resign.  This enraged Heller, because rather than agree to resign I was, as Heller said, "creating a record for litigation."  That is what led them to double down on the coercion.

## V.    Legal Basis for My Claims

**Age Discrimination in Employment Act (ADEA)**

93.  The ADEA provides:

*(A) EMPLOYER PRACTICES*

*It shall be unlawful for an employer—*

*(1)to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;*

*(2)to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or*

*(3)to reduce the wage rate of any employee in order to comply with this chapter.*

29 USC Section 623(a).

Heller breached this section by:

➢trying to pressure me to resign from the firm

➢depriving me of the personnel I needed to service my clients

➢refusing to offer any help with client development, even though it is readily available to younger, female or minority Katten lawyers under  formal

program (the Katalyst Sponsorship Program) that I was not eligible to participate in because I was not the right age, sex, or race.

➢dismantling my practice group

➢suspending me without pay

➢terminating me

➢refusing to assign me to another practice group after he terminated the aviation practice group;

–all because of my age (and that of practice head Tim Lynes), as evidenced by:

➢direct evidence: the statements of Heller and Lynes that I should not be dealing with clients at my age and so close to retirement

➢comparators: 1. When he fired me, Heller reassigned 40-year old Brett Seifarth, with my same aviation skills set but 20 years younger, to another practice group. 2. When he fired me, Heller reassigned lawyers in other practice groups, experiencing slowdowns, to other practice groups that could use their skills set. 3. Katten has a formal program providing practice development to young, minority and female lawyers only.


.   **(d)OPPOSITION TO UNLAWFUL PRACTICES; PARTICIPATION IN INVESTIGATIONS, PROCEEDINGS, OR LITIGATION**

*It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to*

*discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.*

29 USC Section 623(d).

Heller and Verde breached this section by:

➢trying to coerce me into resigning from the firm and waiving my claims against the firm after I told Heller and Verde they were violating the ADEA, NYSDHR, and ERISA, and that I would file complaints with the appropriate agencies

➢taking away my right to open new client matters and to represent the firm at conferences

➢insulting and harassing me by email and phone for refusing to resign and waive my claims

➢clawing back 20% of my prior year's pay, resulting in my inability to pay my taxes and creating an obligation on me to repay compensation to the firm

➢physically intimidating me in the meeting to tell me of the clawback

➢suspending me without pay, without cause as required by the firm's partnership agreement

➢Heller's telling me by email that because of my emails asserting my rights, he never wanted to see me around him or at the firm again

➢firing me (which was also without executive committee approval as required by the partnership agreement) a day after I told Heller and Verde I had filed my complaints with the EEOC, NYSDHR, and EBSA.


a)Individuals at least 40 years of age

*The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age.*

29 USC Section 631(a).


**New York State Human Rights Law**

94.  The New York State Human Rights Law provides:

*§ 296. Unlawful discriminatory practices. 1. It shall be an unlawful*

*discriminatory practice:*

*(a) For an employer or licensing agency, because of an individual's*

*age, race, creed, color, national origin, citizenship or immigration*

*status, sexual orientation, gender identity or expression, military*

*status, sex, disability, predisposing genetic characteristics, familial*

*status, marital status, or status as a victim of domestic violence, to*

*refuse to hire or employ or to bar or to discharge from employment such*

*individual or to discriminate against such individual in compensation or*

*in terms, conditions or privileges of employment.*

The violations track those of the ADEA.

*(d) For any employer or employment agency to print or circulate or*

*cause to be printed or circulated any statement, advertisement or*

*publication, or to use any form of application for employment or to make*

*any inquiry in connection with prospective employment, which expresses*

*directly or indirectly, any limitation, specification or discrimination*

*as to age, race, creed, color, national origin, citizenship or*

*immigration status, sexual orientation, gender identity or expression,*

*military status, sex, disability, predisposing genetic characteristics,*

*familial status, marital status, or status as a victim of domestic*

*violence, or any intent to make any such limitation, specification or*

*discrimination, unless based upon a bona fide occupational*

*qualification;...*

Katten's internal advertisement of its client development program (the Katalyst Sponsorship Program) and minority affinity groups which in each case were not open to white males constituted violations of this section.

*(e) For any employer, labor organization or employment agency to*

*discharge, expel or otherwise discriminate against any person because he*

*or she has opposed any practices forbidden under this article or because*

*he or she has filed a complaint, testified or assisted in any proceeding*

*under this article.*

These violations track Katten's violations of the ADEA as discussed above.

*(h) For an employer, licensing agency, employment agency or labor*

*organization to subject any individual to harassment because of an*

*individual's age, race, creed, color, national origin, citizenship or*

*immigration status, sexual orientation, gender identity or expression,*

*military status, sex, disability, predisposing genetic characteristics,*

*familial status, marital status, status as a victim of domestic*

*violence, or because the individual has opposed any practices forbidden*

*under this article or because the individual has filed a complaint,*

*testified or assisted in any proceeding under this article, regardless*

*of whether such harassment would be considered severe or pervasive under*

*precedent applied to harassment claims. Such harassment is an unlawful*

*discriminatory practice when it subjects an individual to inferior*

*terms, conditions or privileges of employment because of the*

*individual's membership in one or more of these protected categories.*

*The fact that such individual did not make a complaint about the*

*harassment to such employer, licensing agency, employment agency or*

*labor organization shall not be determinative of whether such employer,*

*licensing agency, employment agency or labor organization shall be*

*liable. Nothing in this section shall imply that an employee must*

*demonstrate the existence of an individual to whom the employee's*

*treatment must be compared. It shall be an affirmative defense to*

*liability under this subdivision that the harassing conduct does not*

*rise above the level of what a reasonable victim of discrimination with*

*the same protected characteristic or characteristics would consider*

*petty slights or trivial inconveniences.*

These violations track Katten's violations of the ADEA as discussed above.

*1-a. It shall be an unlawful discriminatory practice for an employer,*

*labor organization, employment agency or any joint labor-management*

*committee controlling apprentice training programs:*

*(a) To select persons for an apprentice training program registered*

*with the state of New York on any basis other than their qualifications,*

*as determined by objective criteria which permit review;*

*(b) To deny to or withhold from any person because of race, creed,*

*color, national origin, citizenship or immigration status, sexual*

*orientation, gender identity or expression, military status, sex, age,*

*disability, familial status, marital status, or status as a victim of*

*domestic violence, the right to be admitted to or participate in a*

*guidance program, an apprenticeship training program, on-the-job*

*training program, executive training program, or other occupational*

*training or retraining program;*

Katten excluded me from its client development program (the Katalyst Sponsorship Program) because I am an older white male. The program is open only to young, female or minority lawyers.

*(c) To discriminate against any person in his or her pursuit of such*

*programs or to discriminate against such a person in the terms,*

*conditions or privileges of such programs because of race, creed, color,*

*national origin, citizenship or immigration status, sexual orientation,*

*gender identity or expression, military status, sex, age, disability,*

*familial status, marital status, or status as a victim of domestic*

*Violence;...*

Katten excluded me from its client development program (the Katalyst Sponsorship Program) because I am an older white male. The program is open only to young, female or minority lawyers.

*3-a. It shall be an unlawful discriminatory practice:*

*(a) For an employer or licensing agency to refuse to hire or employ or*

*license or to bar or to terminate from employment an individual eighteen*

*years of age or older, or to discriminate against such individual in*

*promotion, compensation or in terms, conditions, or privileges of*

*employment, because of such individual's age.*

These violations track Katten's violations of the ADEA as discussed above.

*(b) For any employer, licensing agency or employment agency to print*

*or circulate or cause to be printed or circulated any statement,*

*advertisement or publication, or to use any form of application for*

*employment or to make any inquiry in connection with prospective*

*employment, which expresses, directly or indirectly, any limitation,*

*specification or discrimination on account of age respecting individuals*

*eighteen years of age or older, or any intent to make any such*

*limitation, specification, or discrimination.*

*(c) For any employer, licensing agency or employment agency to*

*discharge or otherwise discriminate against any person because he or she*

*has opposed any practices forbidden under this article or because he or*

*she has filed a complaint, testified or assisted in any proceeding under*

*this article.*

These violations track Katten's violations of the ADEA as discussed above.

*7. It shall be an unlawful discriminatory practice for any person*

*engaged in any activity to which this section applies to retaliate or*

*discriminate against any person because he or she has opposed any*

*practices forbidden under this article or because he or she has filed a*

*complaint, testified or assisted in any proceeding under this article…*

These violations track Katten's violations of the ADEA as discussed above.

**New York City Human Rights Law**

95.  The New York City Human Rights Law provides:

*§ 8-107. Unlawful discriminatory practices.*

*1.  Employment. It shall be an unlawful discriminatory practice:*

*(a)   For an employer or an employee or agent thereof, because of the actual*
*or perceived age, race, creed, color, national origin, gender, disability, marital*
*status, partnership status, caregiver status, sexual and reproductive health*
*decisions, sexual orientation, uniformed service, height, weight, or*
*immigration or citizenship status of any person:*

*(1)   To represent that any employment or position is not available when*

*in fact it is available;*

*(2)    To refuse to hire or employ or to bar or to discharge from employment such person; or*

*(3)    To discriminate against such person in compensation or in terms, conditions or privileges of employment.*

*(d)    For any employer, labor organization or employment agency or an employee or agent thereof to declare, print or circulate or cause to be declared, printed, or circulated any statement, advertisement or publication, or to use any form of application for employment or to make any inquiry in connection with prospective employment, which expresses, directly or indirectly, any limitation, specification or discrimination as to age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed service, height, weight, or immigration or citizenship status, or any intent to make any such limitation, specification or discrimination.*

*7.    Retaliation. It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the*

*corporation counsel in an investigation commenced pursuant to this title, (v) requested a reasonable accommodation under this chapter, or ([v]vi) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8-115 of this chapter. The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment, housing or a public accommodation or in a materially adverse change in the terms and conditions of employment, housing, or a public accommodation, provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity.*

These violations track Katten's violations of the ADEA and New York Human Rights Law as discussed above.

**ERISA Section 510**

96. ERISA Section 510 provides:

*It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C. 301 et seq.], or for the purpose of interfering*

74

*with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act. It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter or the Welfare and Pension Plans Disclosure Act. In the case of a multiemployer plan, it shall be unlawful for the plan sponsor or any other person to discriminate against any contributing employer for exercising rights under this chapter or for giving information or testifying in any inquiry or proceeding relating to this chapter before Congress. The provisions of section 1132 of this title shall be applicable in the enforcement of this section.*

Heller and Verde discriminated against me, coerced me, and retaliated against me, (i) to keep me from collecting my pension under the Retirement/Death Benefit Plan and (ii) because I asserted my rights under ERISA in my statements to them and by filing a complaint with EBSA. Heller discriminated against me (i) by not letting me qualify for my base pension under the Retirement/Death Benefit Plan in 2024 and also (ii) not letting me build up my pension by continuing to work for the firm as Seifarth would be allowed to do.

Top Hat Plans are retirement plans whose participants are highly paid "employees." Participants in Top Hat Plans are protected by ERISA Sections 510 and 511. The Retirement/Death Benefit Plan's participants are Katten partners. It is a Top Hat Plan because most of those partners are "employees"

under ERISA.   In her February 23, 2024 email to EBSA in response to its inquiry, Katten employment partner Kate Saracene admitted that if any Katten partners are "employees", the Retirement/Death Benefit Plan is a Top Hat Plan covered by ERISA.  It is straightforward to show that Katten partners are employees, in three ways: (i) Katten's admission  in writing that I am an employee covered by the ADEA, (ii) the terms of Katten's partnership agreement show the partners are really employees under the Supreme Court's test, and (iii) Katten filed its "precautionary" Top Hat Plan Statement signaling that Katten itself thinks its partners are employees for purposes of ERISA.

  In Victor George v. Junior Achievement of Central Indiana (No. 11-3291, 7th Cir. 2012), the court held that a plan sponsor can violate ERISA Section 510 by retaliating against a plan participant for raising an ERISA violation internally within the company (not just in a formal proceeding).   This retaliation constitutes a separate violation of Section 510 whether or not the conduct the participant complains of itself constitutes an ERISA violation. Katten CEO Noah Heller and Katten general counsel Michael Verde started to retaliate against me immediately once I advised them in an email that their plan to fire me to deprive me of my pension constituted a violation of Section 510.  Their pattern of retaliation culminated in Heller's firing me one day after I notified them that I had filed my ERISA complaint with EBSA.

**ERISA Section 404**

97.  ERISA Section 404 provides:

*(a)PRUDENT MAN STANDARD OF CARE*

*(1)Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—*

   *(A)for the exclusive purpose of:*

   *(i)providing benefits to participants and their beneficiaries; and*

   *(ii)defraying reasonable expenses of administering the plan;*

   *(B)with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;...*

29 USC Section 1104.

ERISA Section 404 imposes a fiduciary duty on plan administrators not to mislead participants about their rights under ERISA. Varity Corp. v. Howe, 516 U.S. 489 (1996).  Verde told me I was not protected by ERISA at all.  On July 11, 2023, he emailed me:

*"You are not an "employee" covered by the statutes you cite* [which included ERISA]*, nor have you been subject to any discrimination or unlawful conduct."*

This was misleading, in the following ways:

> ➤ <u>Retirement/Death Benefit Plan</u>:  Before Heller fired me, Verde told me categorically that the Retirement/Death Benefit Plan absolutely was not covered by ERISA because its participants were all partners rather than employees.  One week after Heller fired me, Katten filed a Top Hat Plan Statement with EBSA admitting this plan could be covered by ERISA because Katten partners could be considered employees under ERISA.  See paragraphs 126–127 below.

> ➤ <u>Cash Balance Plan:</u> Similarly, Verde told me that this plan was not covered by ERISA because its participants were all partners rather than employees.  However, Katten gave each participant a Summary Plan Document (required for ERISA plans) stating that the plan was covered by ERISA and made annual filings on Form 5500 with EBSA (required for ERISA plans) stating that the plan was an ERISA plan. See paragraph 125 below.

> ➤ <u>Katten Muchin Rosenman LLP Defined Contribution Plan (a 401(k) plan) and Katten Muchin Rosenman LLP Welfare Benefit Plan (medical, dental, vision, life, and disability insurance)</u>. Verde told me I was not covered by ERISA.  But these are undeniably ERISA plans.

Katten files a Form 5500 for each such plan every year.  Each plan covers partners and employees; the Supreme Court decided in 2003 in <u>Yates v. Hendon</u> that when a plan includes employees and owners, the owners are covered as much as the employees.  In an October 4, 2023 email to Abigail Helbig of EBSA's New York office,  in response to her inquiry, Verde admitted to <u>EBSA</u> what Verde would not admit to <u>me</u>: that I was protected by ERISA under these two plans.

Heller's misleading me was intentional.   He is the sophisticated general counsel of one of the largest law firms in the United States.  He is assisted by deputy general counsel's who are partners in Katten's employment practice. Verde made his statements in emails only after consulting these deputy general counsels.

**ERISA Section 511**

ERISA Section 511 provides:

*It shall be unlawful for any person through the use of fraud, force, violence, or threat of the use of force or violence, to restrain, coerce, intimidate, or attempt to restrain, coerce, or intimidate any participant or beneficiary for the purpose of interfering with or preventing the exercise of any right to which he is or may become entitled under the plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C. 301 et seq.].*

*Any person who willfully violates this section shall be fined $100,000 or imprisoned for not more than 10 years, or both.*

29 USC Section 1141.

Verde tried to coerce me into resigning from the firm and waiving my rights under ERISA by trying to convince me that I had no rights under ERISA anyway. He fraudulently made false statements to me about my rights under ERISA (as described above in the discussion of Section 404) to induce me to resign from the firm and give up my pension under the Retirement/Death Benefit Plan. This violated ERISA Section 511.

**Breaches by the Firm of the Terms of the Firm's Partnership Agreement**

98.    Heller breached the Katten partnership agreement at least five times: (i) by dismantling the aviation practice group after inducing me to leave my prior firm with the promise that I would be joining a robust aviation practice at Katten that was an important part of the firm and that would support my clients' needs; (ii) by deceiving and coercing me in an effort to get me to resign and waive my rights, and retaliating against me for refusing to do so; (iii) by suspending me without pay without having "cause"; (iv) by refusing my request to arbitrate; and (v) by purporting to fire me without the recommendation of the chairman of the firm and approval of the executive committee. Heller not only breached the express terms of the partnership agreement; he also violated the obligation of good faith and fair dealing that is

imposed by Section 404 of the Illinois Uniform Partnership Act. That section also prohibits intentional misconduct and knowing violation of the law. Heller and Verde stereotyped me because of my age, lied to me, harassed and humiliated me, and hurt an important client of the firm just to punish me.

**Breaches of the Illinois Uniform Partnership Act**

99.    The Partnership Agreement provides that it is governed by the Uniform Partnership Act of the State of Illinois (the "Act").   Heller, Verde and Lynes individually and as agents of the partnership committed many violations of the Act.

100.   <u>Section 403(c).</u>  Section 403(c) of the Act provides that "*Each partner and the partnership shall furnish to a partner…(1) without demand, any information concerning the partnership's business and affairs reasonably required for the proper exercise of the partner's rights and duties under the partnership agreement or this Act…*"   Katten, Heller and Lynes breached this clause by failing ever to give me any information about the business plans or personnel decisions concerning the aviation finance practice.  This prevented me from effectively running my practice. Heller concealed from me his plans to dismantle the aviation practice group.  See also below.

101.   <u>Section 404(c).</u>  Section 404(c) of the Act prohibits a partner from acting toward his other partners with intentional misconduct or a knowing violation of law.  See above regarding Katten's violations of ERISA, the

OWBPA, other provisions of the ADEA, and state anti-discrimination law. See also below.

102.    <u>Section 404(d)</u>.  Section 404(d) of the Act provides, "*A partner shall discharge his or her duties to the partnership and the other partners under this Act or under the partnership agreement and exercise any rights consistent with the obligation of good faith and fair dealing.*"  Heller, Verde and Lynes breached the obligation of good faith and fair dealing, committed intentional misconduct and further breached the partnership agreement as follows:

> ➢ Heller and Lynes' inducing me to leave Kaye Scholer on the basis that Katten had and would maintain an aircraft finance practice group and breaching that promise.

> ➢ Heller's firing, not promoting, or not replacing the experienced, diverse aviation lawyers and paralegals in the group that I needed for my practice and who worked closely with my clients.

> ➢ Heller's depriving me of the personnel necessary to bill time for me to reach the collections expected of a capital partner of this firm.

> ➢ Heller and Lynes' refusing to bring any first year associates into the group from the summer associate classes to refresh the group.

> ➢ Heller and Lynes' refusing to expand the practice group in New York and expand it to London to provide the service my clients needed and to stay competitive with peer firms' practice groups.

➢Heller's cutting my compensation in order to divert firm profits to favored partners including himself.

➢Heller's taking the savings from my terminated colleagues whom I needed for my practice and diverting the money to compensation for favored partners including himself.

➢Heller's failure ever to discuss my practice or personnel needs with me.

➢Discussions of the practice group being limited to Heller and Lynes, with me being given no information.

➢Lynes' concealing from me that he knew Heller would not support the practice (telling me only on March 9, 2023 he had seen "the writing on the wall").

➢Two years after my arrival at the firm, Heller's appointing Lynes managing partner of the DC office, leaving Lynes insufficient time to lead the practice group.

➢Lynes' having to spend so much of his work time as managing partner of the DC office and so little maintaining the aviation practice group that his own client relationships --Embraer, Citibank, and Merx, which has evolved into the much larger Perseus-- withered, leading to a decline in the practice group's reputation and visibility in the

industry which negatively affected my own ability to generate business.

➤Heller's failure to replace Lynes as practice group leader with me or appoint me co-practice group leader even when it became obvious that Lynes could not both be the managing partner of the DC office and pay sufficient attention to the aviation practice group.

➤Heller's failure to solicit feedback from me as to whether Lynes was performing adequately to support my practice.

➤Heller's falsely leading me to think I would be allowed to rebuild my practice by allowing me to develop a London-based team of aviation colleagues.

➤Heller's terminating the aviation practice group and moving to expel me from the partnership and end my career, without warning and without a notice of his intent or a cure period.

➤Heller's decision to terminate the practice group on the basis of age discrimination rather than valid business reasons.

➤Verde's presenting me two agreements to resign that would effectively end my career in private practice, end my decades-long client relationships, force me to waive my federally protected rights, and have me agree to an unconscionable potential penalty of disgorging my vested benefits.

➢Heller and Verde's conspiring to deprive me of my Katten defined benefit pension by presenting me a Special Capital Partner agreement deceptively structured to give me so little cash to live on that I would have to withdraw from the firm before qualifying for the pension, and so little compensation that I would be paying for the pension myself.

➢Heller's imposing a penalty on me of 20% ($226,900) of my FY23 compensation for failing to sign the March agreement to resign within two days after you presented it to me, intentionally depriving me of the cash I needed to make my April 2023 tax payments, capital loan repayment, and pension contribution.

➢Heller's discriminating against me as compared to his treatment of Lynes, the only other partner in the aviation practice group, and Brett Seifarth, the only associate (or any other employee of the firm) in the group.

➢Heller's seeking to deprive me of my pension under the Retirement/Death Benefit Plan and compensation to enhance the compensation of Heller and his favored partners.

➢Heller's stating to me that he views me as unworthy of income partner, counsel and associate support for my practice because of my age.

➢Heller and Verde's deliberately not telling me about Special Capital Partner, Of Counsel, or Non-Capital Partner status as an alternative to being terminated.

➢Heller and Verde's having Lynes sign his own agreement with the firm in which he agreed not to tell me (or anyone else) that he was getting protections that I would not get.

➢Lynes' abandoning me from and after March 9.

➢Heller's immediate knee-jerk refusal during the meeting when I asked if I could be redeployed to another practice area (structured finance, for example) that fits my skills set, preferring instead to redeploy Brett Seifarth because he is 20 years younger than I am.

➢Heller's promising me in a March 22 email to give me an answer as to whether the firm can offer me a Special Capital Partner arrangement and if so on what terms "as soon as possible", and Verde's not getting back to me until May 30.

➢Heller's giving a bad-faith blanket denial in the March 22 email of "almost every fact" I stated in my email to him and Verde and then refusing to say what exactly he disagreed with.

➢Verde's trying to get me to resign and waive my rights the same way he got a suspect to confess to a crime when he was a New York City police detective: lie, threaten and browbeat.

➤Verde's telling me falsely in writing that the reason Heller had decided to wind down the practice group was that Lynes had decided to retire; Lynes had told me six months earlier he had no plans to retire, and on March 9 told me he was actually being forced by Heller to retire and sign an agreement to resign.

➤Otherwise giving me false, incomplete and misleading information before, during and since the March 16 meeting.

➤Mocking and insulting me in writing for asserting my federally protected rights, including calling me "unhinged" in writing.

➤ Verde's haranguing me to make a "decision", meaning resign and waive my rights or be fired.

➤Breaching ERISA and the ADEA (including the OWBPA) and state antidiscrimination law as discussed above.

➤Heller's deliberately deciding to terminate me the year I turn 61, in the last annual cycle before the normal six-month severance period would brush up against the date I would become eligible to start receiving the partners' defined benefit pension at the firm's normal retirement age of 62, in order to make his depriving me of my pension less obvious.

➢Humiliating me by forcing me in my 60s into the job market where firms have now told me they are not interested in bringing on someone who will be perceived as just marking time until retirement.

➢Verde's overtly depriving me of the privileges of partnership in order to force me to resign from the firm, by blocking me from opening matters for my new clients Royal Air Maroc and Mirati Therapeutics.

➢The attitude that Heller and Verde have that they may treat a partner without regard to their obligations under the Partnership Agreement or applicable law, and if that partner complains, they will browbeat him into waiving his claims or cause him to suffer a maliciously timed cut in compensation or expulsion from the firm.

103.    Section 405(b).  Section 405(b) of the Act provides that "*a partner may maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business, to: (1) enforce the partner's rights under the partnership agreement; [or] (2) enforce the partner's rights under this Act, including: (i) the partner's rights under Section 401, 403, or 404;...*"

**Promissory Estoppel**

104.    Heller and Lynes induced me to leave my prior firm on the promise of a robust growing aircraft-finance practice group where I could serve my clients and generate large amounts of revenue for the firm.  Heller then made

Lynes managing partner of the DC office, taking away the time he needed to spend to develop the practice group. Heller then forced out or did not replace the other lawyers I was promised to support my practice.   This caused me to permanently lose business and thus personal income and end my career.

**Fraudulent Misrepresentation**

105.    Knowingly misrepresenting to me that I would have a robust practice group at Katten whose ongoing growth was strategically important to the firm in order to induce me to leave my prior firm.

**Intentional Infliction of Emotional Distress**

106.    Heller and Verde's actions, including coercion, harassment, and retaliation, were intended to and did cause me severe emotional distress.

**Tortious Interference with Business Relationship**

107.    Heller and Verde intentionally destroyed my relationship with my most longstanding and lucrative client, Castlelake.  As Heller and Verde well know, without portable business a partner is unemployable.

**Civil Conspiracy**

108.    Heller and Verde conspired to commit the unlawful acts described above.

**VI.    <u>Complaints Filed With Agencies</u>**

109.    Following Heller's suspending me without pay on August 1, 2023, on August 2 and 3, 2023 I filed complaints online with (i) the EEOC (for Katten's violations of the ADEA), (ii) the New York State Division of Human Rights (for Katten's violations of the New York Human Rights Law), and (iii) the Employee Benefits Security Administration (EBSA) of the US Department of Labor (for Katten's violations of Section 510, 511 and 404 of ERISA).

110.    Pursuant to the EEOC rules, EEOC investigator Dolanda Young in the New York regional office interviewed me to verify my discrimination complaint was legitimate.  With her assistance, I submitted my Charge of Discrimination to the EEOC on October 12, 2023 (the "Charge"). On October 21, 2023, the EEOC notified Katten of the Charge and notified Katten it had 30 days to provide a response to the Charge including supporting documentation.  Katten ignored the notice.  On December 3, 2023, EEOC investigator Sylvia Deng-Batista emailed Noah Heller, Michael Verde and Katten human-resources director James Berge to remind them to submit a response, and even gave Katten an extended deadline of December 21, 2023. Katten did not submit a response until March 5, 2024, and even then did not include any supporting documentation. On December 9, 2024, I received an email from the EEOC stating that Katten's response to the Charge (called a Position Statement) was now available to me on the EEOC Public Portal and asking that I respond to the Position Statement by January 8, 2025, which I did.

111.    In its Position Statement, Katten asks that the EEOC dismiss my Charge on the jurisdictional grounds that under the legal test to determine if a law firm partner is an "employee" covered by age-discrimination law, I was not an "employee."   However, as Katten admitted in the waivers it tried to coerce me to sign, and in a filing it made with the U.S. Department of Labor, under the standard the EEOC itself laid out in the landmark case against another very large law firm, Sidley Austin, I was clearly an employee. Accordingly, this Court should should reject any request by Katten to dismiss my claims of violations of the ADEA, ERISA, the New York State Human Rights Law, and the New York City Human Rights Law.  I further discuss this point below.

**In the Position Statement Katten Filed with the EEOC, Katten Did Not Deny Discriminating Against Me.**

112.    After Katten received my Charge and request by the EEOC to submit a response, Heller and Verde surely read the Charge carefully and discussed what to say in the response, and discussed the charge with Julie Gottshall, Katten's deputy general counsel and head of the firm's employment practice. So everything that Verde said – and did not say– in the Katten Position Statement was done carefully and intentionally.   In the Katten Position Statement, Verde does not deny, explain, or otherwise address any of the specific discriminatory, retaliatory and coercive conduct that I described in the Charge and summarize above, or include any personnel records or other documentary evidence to support its position.  The reason is that Heller and

Verde know that everything I said is accurate. They also know that if they falsely denied what they know to be true in a submission to a federal agency, that would constitute a crime under federal law. A respondent's reply to a charge of discrimination is intended to be the one opportunity of that respondent to tell the EEOC what in the complaint the respondent disagrees with. This means that this Court should deem the facts set forth in my Charge as admitted.

The EEOC's own rules on position statements provide as much (https://www.eeoc.gov/employers/effective-position-statements):

*"In general, a position statement should include specific, factual responses to every allegation of the charge, as well as any other facts which you deem relevant for the EEOC's consideration. The position statement should clearly explain the Respondent's version of the facts and identify the specific documents and witnesses supporting its position."*

*"The EEOC also requests that you submit all documentary evidence you believe is responsive to the allegations of the charge or supports any asserted defenses. If you submit only an advocacy statement, unsupported by documentary evidence, the EEOC may conclude that Respondent has no evidence to support its defense to the allegations of the charge."*

113. On February 17, 2025, EEOC investigator Carlos Montas of the New Orleans regional office, to which the New York regional office had transferred my case for the stated reason of distributing the EEOC workload, called and

told me that because of the disruption caused by the new administration, the EEOC did not have the resources to handle my case and would therefore close it and issue me a right-to-sue letter. I asked that Mr. Montas first try to engage Katten in informal settlement discussion, which he did. Despite my making several settlement proposals, Katten general counsel Michael Verde declined to pursue settlement on the grounds that the defendant and I were not in the same "universe." On February 27, 2025, the EEOC issued me a right-to-sue letter and closure notice, stating as in all such documents that the EEOC took no position on the merits of my charge. Notably, the EEOC refused Katten's motion in its Position Statement to dismiss my complaint on the grounds that I was not an "employee."

114.    On November 10 , 2023, Katten filed a response with the NYSDHR to my complaint. Katten did not respond to the factual allegations at all. Instead, Katten moved to dismiss my case on the grounds that I was not covered by federal or state anti-discrimination law because I was an owner of Katten. As authority for this proposition, Katten cited a case in which one gastroenterologist in a practice of four gastroenterologists sued the practice for age discrimination, and ignored the Sidley Austin case entirely. It also ignored the facts that (i) the firm had twice given me the 21-day period required by the ADEA to consider the agreements to resign it had put in front of me because they contained waivers of my age-discrimination claim, (ii) the agreements to resign recited that I was entitled to the 21-day period and other protections mandated by the ADEA, and (iii) one week after firing me Katten

filed a statement with the US Department of Labor conceding that its partners can be employees.  In February 2024, Caroline Downey, general counsel of the NYSDHR, rejected Katten's motion and ruled that the investigation into the merits of my complaint would move forward.  So two agencies charged with interpreting and enforcing anti-discrimination law, the EEOC and the NYSDHR, both rejected Katten's motions to dismiss my complaints immediately, rejecting Katten's argument that because I was not an "employee" I was not protected by anti-discrimination law."

115.    The NYSDHR gave Katten another opportunity to reply to the facts I set forth in my complaint.  In Katten's further reply, Julie Gottshall, deputy general counsel of Katten, did not deny that Heller and Verde had told me I was too old to be trusted with client matters any longer.  She said instead that Heller and Verde's statements:

➤    *"... simply reflect certain realities about having a diminishing practice at an advanced stage of one's career."*

There are "certain realities" inherent in being in "an advanced stage of one's career."  Given the chance to explain, Katten does not deny age bias;  Katten confirms it.  Katten viewed Lynes (then age 64) and me (then age 60) as getting too old to handle clients and bring in revenue and forced us out.

116.    In November 2023 investigator Abigail Helbig of the New York regional office advised me that because of the limited resources of EBSA, it

could not pursue every claim of discrimination and advised me to pursue my claims under ERISA Sections 510, 511 and 404 in court.

## VII.    Partners are protected by anti-discrimination law.

**Partners in large, centrally controlled law firms can be employees for the purposes of anti-discrimination law.**

117.    Katten has repeatedly and futilely argued that I am not protected by anti-discrimination law because such law protects "employees" but not "owners" of a company. I am protected. My situation is exactly like that of 32 older partners at another large centrally controlled Chicago-based law firm, Sidley Austin. In a landmark age-discrimination case, Sidley admitted to the EEOC that those partners were "employees" for purposes of the Age Discrimination in Employment Act and paid them $27 million in age-discrimination damages.

118.    The controlling Supreme Court precedent is *Clackamas Gastroenterology Associates v. Wells*, CLACKAMAS GASTROENTEROLOGY ASSOCIATES, P. C. v. WELLS. | Supreme Court | US Law | LII / Legal Information Institute (cornell.edu). In discussing whether a "partner" in a professional-services firm could be considered an "employee" for purposes of anti-discrimination law, the Court stated, "Today there are partnerships that include hundreds of members, some of whom may

well qualify as "employees" because control is concentrated in a small number of managing partners." There the Court cited the Equal Employment Opportunity Commission's then-pending age-discrimination case against another large Chicago-based national law firm very similar to Katten, called Sidley Austin.

**Unique among large law firms, Katten is run by a single Chief Executive Officer, whom the capital partnership does not elect or influence.**

119. In 2013, shortly before I joined Katten, the firm underwent a major reorganization in its management because it was thought that the firm was not being run efficiently. Katten is one of the largest law firms in the country, with over 700 lawyers in offices throughout the United States, in London, and in Shanghai. Decisionmaking was getting bogged down because too many things had to be deliberated by and voted on by 150 capital partners. So Katten reorganized its management to take decisionmaking away from partner voting. (In 2021, at my own behest, I wrote an internal firm history of Katten. As part of that exercise, I interviewed former firm leaders including Vincent Sergi who explained this to me. The reasons for the reorganization are well known and were discussed in the legal press at the time.) Katten created a corporate management structure with the power to run the firm vested in a new role: Chief Executive Officer. Not "managing partner" or "presiding partner" – a first-among-equals as in other firms. It is no accident that the title of Chief Executive Officer was borrowed from the world of corporations. To my knowledge after doing an internet search, none of the other 100 largest law

firms in the U.S. has a Chief Executive Officer.    The role at Katten of the Chief Executive Officer is specified in Section 11.4 of the Katten partnership agreement:

> *"The Chief Executive Officer will have the power and authority … to take such actions… as may be necessary, useful or appropriate to manage and direct the Firm's business, operations and affairs on both a day-to-day and a long-term basis… Without limiting the foregoing, the Chief Executive Officer will be the chief executive officer of the Firm and will, in general, supervise all of the operations and day to day management of the Firm."*

120.    Since Katten created the position of Chief Executive Officer in 2013, Katten has had only one Chief Executive Officer: Noah Heller, a partner resident in the New York office.  The appointment of Heller by name as Chief Executive Officer is actually specified in Section 11.4.1 of the partnership agreement.  Heller is the person who terminated my practice group, forced my practice group head Tim Lynes to retire, redeployed 39-year-old Brett Seifarth to another practice group, and fired me.  Under the terms of Section 11.4 of the partnership agreement as originally adopted, the Chief Executive Officer could serve a maximum of three four-year terms.  Heller's third term as Chief Executive Officer will expire on June 30, 2025.  Rather than step aside to allow the naming of a successor Chief Executive Officer, in 2022 Heller pushed through an amendment to the partnership agreement to allow the Chief Executive Officer to serve an unlimited number of terms. It is fully expected that Heller will serve as Chief Executive Officer indefinitely.

121.    Moreover, if and when there is a new Chief Executive Officer, he will not be selected by the full partnership.  Instead, as provided in Section 11.4.1 of the partnership agreement, he will be selected by the Executive Committee. Under Section 11.7 of the partnership agreement, Katten has an 11- member executive committee which includes as one of those members the Chief Executive Officer himself.   Under Section 11.7 of the partnership agreement, any vacancy in the Executive Committee will be filled by the Executive Committee itself.  Under the terms of the partnership agreement, at no time do the ordinary capital partners of Katten, as I was, have any right to nominate or vote for the members of the Executive Committee.  The Executive Committee is thus self-perpetuating.  The same situation applied in the landmark age discrimination case brought by 32 partners of Sidley Austin, another large, centrally controlled Chicago law firm.  The partners successfully argued that they were actually employees for purposes of age discrimination law.  See *EEOC v. Sidley Austin Brown & Wood*, 315 F. 3d 696 (7th Cir.2002), cited approvingly in the Clackamas case that Katten agrees is controlling.  The court found it dispositive that – just as with Katten— *"The firm is controlled by a self-perpetuating executive committee" and the partners did not have sufficient say in the management of the firm to be considered "employers."* The EEOC therefore compelled Sidley to pay $27.5 million in age-discrimination damages to this group of partners and to admit that such partners were "employees" for purposes of age-discrimination law.  The same analysis applies to ERISA claims.  In *Ehrlich v. Howe*, 848 F. Supp. 482

(S.D.N.Y. 1994), the court stated, "The statutory definition of "employee" under ERISA is virtually identical to that of the Age Discrimination in Employment Act …. and Title VII…  cases construing the definitional purposes of one are persuasive authority when interpreting the others…"

122.    So despite being a supposed "owner" of the firm, I – along with the vast majority of the other capital partners– had no right to nominate or vote for Chief Executive Officer, the firm's chief decisionmaker; no right to nominate or vote for any member of the body (the Executive Committee) that selects the Chief Executive Officer; and no other right, under the partnership agreement or *de facto*, to participate in any way directly or indirectly in the management of the firm.  There is nothing inherently wrong about this system. It may even be necessary for a large firm like Katten or Sidley, and many partners would just as soon entrust management decisions to someone else. However, the EEOC has determined that in a law firm that chooses to run itself this way– like a corporation– partners will be treated as employees for purposes of laws against discrimination.

**The Sidley Austin Case is Controlling Precedent**

123. The settlement agreement between Sidley and the EEOC stated:

*"Sidley agrees that each person for whom EEOC has sought relief in this matter was an employee with the meaning of the ADEA."*

Sidley Austin agreed with the EEOC that because the firm was controlled by an executive committee that was not elected by the partnership, the partners were employees within the meaning of the ADEA.

As the EEOC itself explained in a press release (:EEOC Charges Sidley & Austin With Age Discrimination | U.S. Equal Employment Opportunity Commission):

*"EEOC's Regional Attorney in Chicago, John C. Hendrickson, said that in resisting the EEOC investigation and in forcing the EEOC to obtain judicial enforcement of its subpoena, "Sidley's unwavering position has been that the matters involving how the law firm dealt with those it referred to as 'partners' and whether it engaged in discrimination  were simply way beyond the reach of the ADEA and EEOC."  However, according to Hendrickson, the EEOC administrative investigation revealed that, "except for a very few controlling partners at the very top, Sidley's lawyers appeared to be ordinary employees not unlike their colleagues at parallel levels in the business community and, therefore, covered by the ADEA."*

*"Hendrickson said, "Whatever titles Sidley had decided to give these lawyers partner, counsel, or otherwise  our investigation indicated that they had no voice or control in governance of the firm and that they could be and were fired just like any other employees  without notice and without the vote or consent of their fellow attorneys.  A small self-perpetuating group of managers at the top ran everything, and that was it  – end of story."*

"'Of course,' added EEOC Trial Attorney Deborah Hamilton, 'having the power to fire an employee does not mean that a law firm or any other covered employer can do so because of the employee's age, if the employee is over 40. That is a violation of the ADEA and that  the making of unlawful age-based selections for termination is precisely what EEOC is targeting in this lawsuit.'"

"[T]the mere fact that a person has a particular title — such as partner, director, or vice president — should not necessarily be used to determine whether he or she is an employee or a proprietor….Today there are partnerships that include hundreds of members, some of whom may well qualify as "employees" because control is concentrated in a small number of managing partners."   EEOC v. Sidley Austin Brown & Wood, 315 F.3d 696, 709 (7th Cir. 2002).  See also Simpson v. Ernst & Young, 100 F.3d 436 (6th Cir. 1996).

**As evidenced by its  sudden filing with the U.S. Department of Labor one week after I filed my complaints, and as Katten intentionally concealed from me, Katten admits most Katten capital partners are employees for purposes of anti-discrimination law.**

124.    On August 2 and, 2023, as I told Heller and Verde, I filed age-discrimination and ERISA complaints against Katten.  In response, Heller fired me on August 4.  A week later, on August 11, 2023, Katten filed a "Top Hat Plan Statement" with EBSA.  The Top Hat Plan Statement covers the

Katten    Muchin    Rosenman    LLP    Second    Amended    and    Restated
Retirement/Death Benefit Plan.

125.    A Top Hat plan is a nonqualified deferred compensation plan limited
to highly paid employees.  A Top Hat plan is subject to ERISA, but because
its participants are limited to highly paid employees, it is exempt from
ERISA's substantive requirements (participation, vesting, funding and
fiduciary requirements).  A Top Hat Plan is not exempt from the reporting and
disclosure requirements of Part 1 of Title I of ERISA or the administration and
enforcement provisions of Title 5 of Part I of ERISA.  However, the reporting
and disclosure requirements can be satisfied by making a one-time filing of a
Top Hat Plan Statement with EBSA within 120 days after the Top Hat Plan
becomes effective.        See   1907_Fall_2019_NQDC_Top_Hat_Plan_0.pdf
(psca.org).   Again, Top Hat Plans are still subject to Title 5 of Part 1 of
ERISA, which includes Section 510 (anti-discrimination) and 511 (anti-fraud),
which I am claiming.

126.    The Retirement/Death Benefit Plan became effective on July 1, 2017.
Katten never filed a Top Hat Plan Statement, on the grounds that the plan was
not an ERISA plan at all, because only participants in the plan were Katten
capital partners and not "employees."    Yet once I filed my complaints in
August 2023, Katten was immediately concerned that the EEOC or EBSA or
this Court would soon rule that I (and other Katten capital partners) were
actually employees for purposes of age- discrimination law and ERISA.  (The
same    analysis    of    whether    partners    are    employees    applies    for    age

discrimination and ERISA.) And if that happened without Katten having filed a Top Hat Plan Statement, the plan would immediately become subject– retroactive to 2017– to the full set of ERISA's participation, vesting, funding and fiduciary requirements, none of which Katten had ever complied with. The Top Hat Plan Statement states:

*"Katten has always maintained and still maintains that the Plan does not cover and has never covered any employees and therefore is and has been exempt from ERISA since its inception. Nonetheless, Katten is making this filing as a preventive measure* **_in the event any of its capital partners are later determined by a court or agency to be common law employees_** *[emphasis added], and therefore the Plan would become subject to ERISA."*

Katten would not have taken this "preventive measure" one week after I filed my complaints unless it believed that the EEOC or DOL or this Court were about to determine in response to my complaints that most Katten partners including me are really employees.

127.     Verde told me on July 11, 2023 that the firm had the right to fire me in order to deprive me of my pension because the Retirement/Death Benefit Plan was not subject to ERISA because it was not a Top Hat Plan, the reason being that did not cover "employees."   However, he – advised by three deputy general counsels from Katten's sophisticated labor and employment law practice– knew at that time that certain partners may very well be employees,

protected by ERISA, the ADEA and state anti-discrimination law, based on the Sidley Austin precedent.

In his October 4, 2023 email to Abigail Helbig of the EEOC's New York regional office, Verde confirmed that he told me unequivocally that the Retirement/Death Plan was not an ERISA plan:

> "On July 11, 2023, Mr. Herman was advised via email that the Firm's nonqualified deferred compensation plan, and its Cash Balance Plan, are not subject to ERISA because neither plan has any employee participants."

Specifically, he told me:

> "Regarding ERISA, only Capital Partners such as yourself participate in the Nonqualified Retirement Plan (as defined in the May 30 draft offer letter).  This is a non-tax-qualified deferred compensation arrangement, not a pension plan, and no employees participate in this Plan.  As such, the Nonqualified Retirement Plan is not subject to ERISA, and none of your threatened claims under ERISA have any merit."

He tried to convince me to resign from the firm and waive my ERISA rights for a small amount of severance pay by telling me falsely that I had no ERISA rights anyway.

Compare Verde's statement to me about the Retirement/Death Benefit Plan to Deputy General Counsel Saracene's statement to Ms. Helbig about that plan on February 23, 2024.   Saracene's statement tracked what Katten had told EBSA in the Top Hat Plan Statement on August 11, 2023, one week after I filed my complaint with EBSA and Heller fired me:

> "Katten has always maintained that the Plan does not cover any employees and therefore is exempt from ERISA. Accordingly, the Plan does not have a Summary Plan Description.
>
> Notwithstanding the foregoing, Katten filed a Top Hat Plan Statement as a preventive measure in August of 2023, so that in the event any of its capital partners are later determined by a court or agency to be common law employees (and therefore the Plan would become subject to ERISA), the Department is on notice that the Plan is maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated individuals."

 Verde knowingly concealed this fact from me in his attempt to induce me to waive my ERISA rights.  Then Katten deliberately waited until it knew I had already filed my complaint with EBSA on August 2, 2023 before Katten filed its Top Hat Plan Statement on August 11 containing this admission.  Katten knew that if it filed its Top Hat Plan statement before I filed my complaint, I would have found the Top Hat Statement on the EBSA website and brought the Top Hat Statement – and Katten's admission that its partners are

employees under ERISA-- to EBSA's attention in my complaint. Katten's conduct constitutes not only a breach of ERISA Sections 404 and 510, but also of ERISA Section 511, which prohibits the use of fraud to induce someone to give up his rights under ERISA or an ERISA plan.

128.    Katten maintains a benefit plan called the Katten Muchin Rosenman Cash Balance Plan. Just like the Retirement/Death Benefit Plan, the Cash Balance Plan is, and at all times has been, open only to capital partners, who are required to participate in it. Benefit plans that cover "owners" only are not subject to ERISA. Yet according to Katten, the Cash Balance Plan was fully subject to ERISA. That must mean that not all capital partners are "owners"; some must be employees. When I joined the firm, I received a Summary Plan Description for this plan, as required by ERISA. The Summary Plan Description states, *"As a participant in the Plan, you are entitled to certain rights and protections under ERISA."* ERISA requires that each Summary Plan Description contain only accurate information. Similarly, the full Katten Muchin Rosenman LLP Cash Balance Pension Plan document, as amended, has numerous references to the protections afforded to the Plan participants under ERISA. Also as required by ERISA for covered plans, each year Katten filed an Annual Report for the Cash Balance Plan with the Department of Labor on Form 5500. Each such report states prominently at the top of the first page: *"[T]his form is required to be filed for employee benefit plans under section 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA)..."* Each report is signed by a Katten official after the

following statement: *"Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true, correct and complete."* The report further states: *"The Plan is a defined benefit pension plan covering U.S.-based capital partners of the Firm. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended (ERISA)."* Finally, ERISA requires that each annual report be audited. The auditor's report of Grant Thornton LLP that accompanies each annual report includes the statement: *"We have performed an audit of the financial statements of Katten Muchin Rosenman LLP Cash Balance Pension Plan (the "Plan"), an employee benefit plan subject to the Employee Retirement Income Security Act of 1974 (ERISA)..."* I sent an email to Verde with these facts. He replied, *"...the Cash Balance Pension Plan is limited to Capital Partners and has no employee participants, and so is similarly not subject to ERISA, again nullifying your threatened ERISA claims."* Notwithstanding that, as I reminded him, the Summary Plan Description provided by the firm to every participant stated, "*As a participant in the Plan, you are entitled to certain rights and protections under ERISA*" and the annual reports to EBSA on Form 5500 provided, "*The Plan is a defined benefit pension plan covering U.S.-based capital partners of the Firm. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended (ERISA)*", Verde deliberately chose to tell me the Cash Balance Plan was just not subject to ERISA without even trying

to explain why the Summary Plan Description and annual reports repeatedly said it was. This was just deceitful. Verde knew that the reason the firm complied with all of the ERISA requirements for the Cash Balance Plan is that many capital partners are not in fact owners. A plan that is mixed– i.e. covers owners and employees– is an ERISA plan. This is why Katten's medical/dental and life/disability insurance plans – which cover partners and non-partner employees–are indisputably ERISA plans. This deceit by Verde, a fiduciary with respect to all of Katten's ERISA plans, constitutes a breach of ERISA Section 404. Moreover, Katten's repeated written representations in the plan document, Summary Plan Description, and Annual Reports that the Cash Balance Plan is covered by ERISA despite including capital partners only, and its full compliance with all of ERISA's fiduciary, investment and other obligations for this plan, constitute an admission by Katten that many capital partners are "employees."

**In the waiver of my discrimination claims that Katten tried to get me to sign, Katten in fact admitted that I am covered by the Age Discrimination in Employment Act.**

129.    In the two agreements to resign that Katten tried to coerce me to sign, each of which included a waiver of my age-discrimination claims, Katten stated that I would have 21 days to consider it and could revoke it up to seven days after I signed it. The reason Katten gave me those two periods is that they are required under the ADEA in order for a waiver of ADEA claims to be valid. If Katten did not think I was an "employee" under the ADEA, Katten

would not have had to give me the 21-day and 7-day periods. So giving me these periods is an admission by Katten that I was an "employee" under the ADEA. That also makes me an "employee" under ERISA. Katten cannot now say that I am not covered because I am not an employee. The waiver shows that Katten already made the determination that even though my title was partner, I was an employee entitled to the protection of the ADEA.

From the agreements to resign:

*"H. Knowing and Voluntary Waiver*

*1.        Revocation Period.* ==*You have the right to revoke your acceptance of this Agreement, solely with respect to your release of claims under the Age Discrimination in Employment Act and the Older Workers Benefit Protection Act, for up to seven (7) days after you sign it.*== *In order to revoke this Agreement, you must sign and send a written notice of the decision to do so, addressed to Noah S. Heller, Katten Muchin Rosenman LLP, 50 Rockefeller Plaza, New York, NY 10020-1605 (with a copy sent via electronic mail to Noah's Firm email address), and that written notice must be received no later than the eighth day after you signed this Agreement.*

*2.        Consideration Period.* *You acknowledge that: (a) you have carefully read this Agreement and fully understand its meaning; (b) you have had* ==*21 days*== *after receiving this offer to review it and decide whether to sign it; (c) the Firm is herein advising you, in writing, to* ==*consult with an attorney*== *(who is not affiliated with the Firm) before signing this Agreement; (d) you*

*are signing this Agreement, knowingly, voluntarily, and without any coercion or duress; (e) everything you are receiving for signing this Agreement is described in the Agreement; (f) no other promises or representations have been made to cause you to sign it, and (g) by executing and delivering this Agreement to the undersigned, you are waiving any remaining portion of such 21-day period."*

The provisions above from the agreements to resign correspond to the requirements below of the Older Workers Benefits Protection Act (which is part of the ADEA):

*SEC. 201. WAIVER OF RIGHTS OR CLAIMS.*

*Section 7 of the Age Discrimination in Employment Act of 1967 (29 U.S.C. 626) is amended by adding at the end the following new subsection:*

*(f)(1) An individual may not waive any right or claim under this Act unless the waiver is knowing and voluntary. Except as provided in paragraph (2), a waiver may not be considered knowing and voluntary unless at a minimum–...*

*(B) the waiver specifically refers to rights or claims arising under this Act;...*

*(E) the individual is advised in writing to consult with an attorney prior to executing the agreement;*

*(F)(i) the individual is given a period of at least 21 days within which to consider the agreement; or...*

*(G) the agreement provides that for a period of at least* 7 days *following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired;...*

**The question of who is an "employee" is the same under ERISA and the ADEA**

130.   The analysis of whether a law firm partner is an "employee" is the same under ERISA, the ADEA and Title VII of the Civil Rights Act.  This proposition is set forth in a case that Katten itself cited in its October 23, 2023 letter to the EEOC, *Ehrlich v. Howe*, 848 F. Supp. 482 (S.D.N.Y. 1994). There the court stated, "The statutory definition of "employee" under ERISA is virtually identical to that of the Age Discrimination in Employment Act …. and Title VII…   cases construing the definitional purposes of one are persuasive authority when interpreting the others…"

**VIII. Defendants Have Waived Their Right to Have this Matter Resolved in Binding Arbitration**

131.   Section 20 of the firm's partnership agreement provides that disputes between the firm and a partner be resolved exclusively through arbitration:

*Any legal or equitable claim, demand, or dispute between a Withdrawn Partner, a Partner or a Principal of a Partner or Withdrawn Partner and the Firm (including any of their agents, partners, employees, attorneys, insurers, administrators, Representatives or permitted assigns) arising out of or*

*relating to this Partnership Agreement, the activities of a Partner while engaged in business, or a Partner's relationship with the Firm or other Partners (including, as applicable, a Principal), shall be resolved solely through binding arbitration pursuant to the Federal Arbitration Act, and the Partner (and, if applicable, such Partner's Principal) and the Firm each waive any right to file or pursue a lawsuit, have a trial by jury, or resolve their disputes in any other forum.*

*Prior to invoking arbitration, the initiating party must submit to the other party a written demand detailing a proposal for resolution of the dispute. The parties shall attempt in good faith to reach a settlement, which shall include participation in mediation before an impartial mediator to occur prior to the arbitration hearing and as early in the process as practicable. The parties shall equally share the expense of mediation and mutually agree in good faith upon the mediator. The mediation shall take place in the Firm's Chicago office.*

On June 27, 2023, by email to Heller and Verde, I specifically invoked mediation and arbitration of my claims under Section 20.   On July 11, 2023, Verde replied by email to say that the firm refused to submit to mediation and arbitration and telling me my only options were to waive my claims and resign or be fired.  On July 18, 2023, I emailed Heller and Verde to tell them they were thus in breach of the partnership agreement.  Their next move was to suspend me without pay on August 1 without cause (another violation of the partnership agreement) and fire me three days later without executive

committee approval (yet another violation of the partnership agreement). In the event that Katten moves to dismiss this complaint on the grounds that Section 20 provides claims must be arbitrated, this Court should deny that motion. Katten refused to arbitrate, in breach of the partnership agreement, in order to deny me any forum for my claims at all. Katten may not be allowed to manipulate the partnership agreement, or any contract, this way, deciding to comply only with the provisions favorable to it and refuse to comply with the ones that are not. In the event that this Court decides that the arbitration provision is valid, given Katten's history of evading its obligations under the partnership agreement, this Court should not dismiss this complaint but rather issue an order to the parties directing them to arbitrate. Such order should specify the procedures for arbitration and provide that the failure to follow such procedures will result in sanctions for contempt of court.

## IX.    <u>Remedies</u>

132.    <u>ADEA</u>.  Under the Age Discrimination in Employment Act (ADEA), individuals who experience age discrimination in the workplace may pursue several remedies under 29 USC Section 626, including:

- **Back Pay**: For the period February 1, 2016 to August 1, 2023, I demand compensation for the diminution in my pay due to Heller's ongoing dismantling of the practice group because of Lynes' age and my age.  This will be not less than 7.5 years x ($3 million (i.e. the average annual Katten senior partner compensation) - $1.2 million (my average annual Katten compensation)), or $13,500,000.  For the period

August 1, 2023 (when Katten stopped paying me) to July 31, 2025 (an assumed date following which reinstatement or front pay will start), this will be at a rate of Katten average senior partner compensation of $3 million per year, or $6,000,000. Total back pay: $19,500,000.

- **Reinstatement**: If reinstatement is feasible, returning me to my former position would be an available remedy for the ADEA violation.

- **Front Pay**: Front pay is awarded when reinstatement is not feasible; Katten is vigorously opposing reinstating me. The first part of the front pay would be $3 million per year, increasing by 5% per year, which is the average recent annual growth in Katten profits per partner, from August 1, 2025 until July 31, 2033, when I expect to retire. This amounts to $24,426,025. The second part would be the aggregate of my pension had I retired on that date, which is 10 years x $240,000 per year, or $2,400,000. Total front pay: $26,826,025.

- **Liquidated Damages**: Because Katten has willfully violated the ADEA, the back pay should be doubled, as permitted by the ADEA. As discussed above in paragraph 92, Heller and Verde's conduct was knowing, premeditated and intentional. The amount of liquidated damages (i.e. in addition to the back pay) would therefore be $19,500,000.

- **Attorney's Fees and Costs**: Reimbursement for my time as my own attorney is appropriate under the ADEA as well.

133.  <u>New York State and Local Law</u>.  Under each of the New York State Human Rights Law (NYSHRL) and New York City Human Rights Law (NYCHRL), individuals who experience age discrimination may pursue several remedies, including:

- **Compensatory Damages**: For deliberately subjecting me to emotional distress in a campaign to force me to break down and resign, I demand $1,000 for each day from and after March 16, 2023 to the date of payment by Katten of damages in this case.  Through and including July 31, 2025, this amounts to $869,000.

- **Back Pay**: As discussed above.

- **Front Pay**: As discussed above.

- **Reinstatement**: As discussed above.

- **Civil Penalties**: This Court may fine Katten for violations of the law.

- **Attorney's Fees and Costs**: As discussed above.

134.  <u>ERISA</u>.  For Katten's violations of ERISA Sections 510, 511 and 404, remedies are available under ERISA Section 502, which provides for the following:

- **Equitable Relief**: In the event this Court does not award front pay as described above, the appropriate remedy would be reinstatement to my former position with Katten along with a guarantee that Katten will not turn around and terminate me again or otherwise discriminate against me.

- **Recovery of Benefits**: In the event this Court does not award front pay for my lost benefits under the Retirement/Death Benefit Plan as described above, an appropriate remedy would be reinstatement to my right to retire and receive my full pension under that plan (assuming 20 years' service as a partner).

- **Attorney's Fees and Costs**: I demand compensation for my own time spent on bringing my agency complaints and filing this complaint. My 2023 billing rate at Katten was $1,465. I have already spent over 95 hours on this matter. Therefore my compensation award should be not less than $133,000.

135.    <u>Breach of Contract</u>. For breaching the Katten partnership agreement and promissory estoppel, the available remedies include:

- **Compensatory Damages**: This consists of the back pay and front pay discussed above.

- **Specific Performance**: This means reinstatement as discussed above. Also, because my purported termination was invalid under Section 11.7.2.9 of the firm's partnership agreement, this Court may order that Katten recognize that I have at all times remained a partner at the firm entitled to be compensated accordingly.

136.    <u>Intentional Infliction of Emotional Distress</u>. Remedies for intentional infliction of emotional distress include:

- **Compensatory Damages**: This consists of monetary compensation for the emotional and psychological pain I have endured.  As discussed above, $869,000.

- **Punitive Damages:** These are awarded to punish the defendant for their outrageous conduct and to deter similar behavior in the future. My demand is to double the compensatory damages, or an additional $869,000.

- **Injunctive Relief**: This means reinstatement as discussed above.

137.    <u>Tortious Interference with Business Relationship</u>.    Remedies for tortious interference with business relationship, fraudulent misrepresentation, and civil conspiracy include:

- **Compensatory Damages:** This includes back pay and front pay as described above.

- **Punitive Damages:** These can be awarded to punish the defendant for its outrageous conduct and to deter similar behavior in the future.

138.    <u>Total Damages Demanded</u>: Not less than $67,697,025, the sum of the amounts described above, plus pre-judgment and post-judgment interest.  I also demand such injunctive relief and other relief as this Court deems proper.

### X. Timeline of Age Discrimination, Coercion, and Retaliation

140.

| Date | Event |
|------|-------|
| **December 6, 2013** | **Katten hires me.**  Timothy Lynes, head of the aircraft-finance practice group of 700-lawyer national law firm Katten Muchin Rosenman LLP, and Noah Heller, Chief Executive Officer of Katten, recruit me to join Katten, in the aircraft-finance practice group in the New York office, by promising me I would be part of a large, prominent and growing aircraft-finance practice. Katten is a large, centrally controlled Chicago-based law firm, just like Sidley Austin, which the EEOC compelled to pay $27 million in damages to 32 older partners for age discrimination. |
| **2016–2023** | **Heller moves Lynes to an administrative role and practice group personnel depart.**  As Lynes approaches his 60th birthday, (i) Heller makes Lynes the near-full-time managing partner of the DC office and (ii) practice-group lawyers and paralegals depart the firm voluntarily or involuntarily and are not replaced. |
| **February 2023** | **Status of group.**  The practice group is down to Lynes (then age 63), lawyer Brett Seifarth (then age 39) and me (then age 60). Seifarth is the "comparator."  See EEOC Compliance Manual |

| | |
|---|---|
| | Section 604.3(a). |
| **March 9, 2023** | **Invitation to meeting.** Heller's assistant sends me an email inviting me to an in-person meeting to be held March 16 with Heller and Michael Verde, General Counsel of Katten. |
| **March 9, 2023** | **Call with Lynes.** I call Lynes to ask the purpose of this meeting. Lynes tells me to my shock that Heller is terminating the practice group and forcing Lynes to retire January 31, 2025. Lynes says Heller is terminating me <u>but retaining 39-year old Seifarth (the comparator) indefinitely and assigning him to work with other practice groups.</u> |
| **March 14, 2023** | **Depriving me of privileges.** Verde starts depriving me of my privileges at the firm by directing Katten conflicts attorney Alina Antounian not to allow me to open any matters for my new client Mirati Therapeutics. |
| **March 16, 2023** | **Notice of discrimination.** I send an email to Heller and Verde telling them that (i) depriving Lynes and me of personnel and then terminating the practice group and forcing Lynes to retire because of our ages, and (ii) terminating me to deprive me of my upcoming pension but reassigning Seifarth, 20 years younger, would constitute age discrimination and discrimination under the Employee Retirement Income Security Act of 1974 (ERISA). |

| March 16, 2023 | **Meeting with Heller and Verde, who are two large, physically imposing men.**<br><br>Heller confirms he is terminating the practice group. Heller tells me that unless I sign an agreement to resign the firm has already prepared in which I will agree to resign from the firm no later than 9/30/23 and waive any discrimination and other claims I have against the firm, he will terminate me.<br><br>I ask Heller if he is willing to redeploy me to another practice group, as he is doing for 39-year-old Seifarth.  Heller tells me he will not do that.<br><br>Heller and Verde make the following statements to me (direct evidence) that show their animus to me (and Lynes) because of my (and his) age:<br><br>1. Verde tells me that Heller and he want me to depart the firm because they do not like to keep lawyers nearing the firm's standard retirement age of 62 (when they qualify for the firm's pension).  He said this is because such lawyers are more likely to be careless knowing they will retire soon and not have to face the consequences of their |

120

| | |
|---|---|
| | carelessness. |
| | 2.  Heller tells me that at my age I should focus on training and mentoring younger lawyers, and not try to maintain an active practice. He said I should go find a job elsewhere mentoring young lawyers.  He said he himself had just hired two lawyers "in their 70s" to do this at Katten, Eliot Lauer and Jacques Semelman.  Note that "direct evidence" of age discrimination can include testimony from the charging party himself as to a statement made by the respondent.  See EEOC Compliance Manual Section 604.3(c). |
| **March 17, 2023** | **First agreement to resign.**  Katten deputy general counsel Brooks Giles emails me the agreement to resign providing that I would voluntarily depart the firm by 9/30/23 and waive my discrimination and any other claims against the firm.  The agreement to resign states that I am protected by the Age Discrimination in Employment Act (ADEA) which  includes the Older Workers Benefits Protection Act (OWBPA). |
| **March 17, 2023** | **Coercion to sign agreement.**  Verde tries to coerce me into signing the agreement to resign by telling me by email that if I do not sign the agreement by April 1, the firm will impose a |

| | |
|---|---|
| | retroactive penalty on me of 20% of my 2022 pay.  (He knows this violates the 21-day waiting period required by the OWBPA.  He nevertheless confirms in an email that I am entitled to that period by law.)  I do not sign the agreement. |
| **March 21, 2023** | **Further coercion**.  Heller ramps up the coercion by telling me by email that if I do not sign the agreement to resign <u>that day</u>, he will go ahead and impose the 20% penalty.  I still do not sign the agreement.  Heller imposes the penalty. |
| **March 21, 2023** | **Further notice of discrimination.**  I email to Heller and Verde saying they are:<br><br>1.  Committing age discrimination against me in violation of the ADEA and state anti-discrimination law.<br><br>2.  Discriminating against me regarding my protected benefits under ERISA by forcing me out of the firm to keep me from retiring with my pension.<br><br>3.  Trying to coerce me into waiving my rights.<br><br>4.  Retaliating against me for raising these rights and refusing to waive them.<br><br>–and that I am ready to file complaints with the EEOC and Employee Benefits Security Administration (EBSA) of the U.S. Department of Labor (DOL), respectively and any other appropriate agencies. |

| | |
|---|---|
| **March 21, 2023** | **Response from Heller.**  In an email, Heller (copying Verde) angrily objects to my creating a written "record" for litigation against the firm. |
| **March 22, 2023** | **Response from Verde.**  Verde (copying Heller) tells me in a harassing email that my ERISA and ADEA claims are "baseless threats" and "attacks", that I have no rights under the ADEA or ERISA, that I am not entitled to "special treatment," that I am making things difficult for myself, and that I am "unhinged." |
| **March 28, 2023** | **Compensation meeting.**  My regular annual compensation meeting occurs.  This is attended by Heller, Katten compensation-committee member Ronni Davidowitz, and me.  Heller confirms he has imposed the penalty of 20% of my 2022 compensation.  Heller is visibly angry and rude.  The meeting lasts 90 seconds. |
| **April 10, 2023** | **Effect of penalty.**  The 20% penalty means that I do not receive the customary annual distribution made on this date.  This distribution is intended for partners to pay federal and state taxes on April 15, and pay the annual installment on the loans they took out from Citibank to finance their contribution to the firm's capital.  Instead of paying me money, the firm tells me in a memo that I must pay back $51,406 in compensation the firm |

| | |
|---|---|
| | previously paid to me.  I am left unable to pay my taxes and loan payment, as Heller intended. |
| **May 11, 2023** | **Harassing call from Verde**.  Verde harangues me over the phone that Heller is upset at how much I am still getting paid without having agreed to resign and waive my claims against the firm. |
| **May 30, 2023** | **Second agreement to resign.**  Giles sends me a second agreement to resign.  This agreement provides:<br><br>1.  I will resign from the firm no later than 12/7/24.<br><br>2.  I will immediately waive all my claims against the firm.<br><br>3.  My net compensation (i.e. compensation less required benefit-plan payments to the firm) will be <u>negative</u> from 7/1/23 to 12/7/24.<br><br>4.  The firm can still fire me for any reason or no reason before 12/7/24.<br><br>5.  I am protected by the ADEA.<br><br>I do not sign the agreement. |
| **June 15, 2023** | **Retaliation by terminating another client relationship.**  Verde again retaliates against me by arranging with Lynes to terminate my new client relationship with the airline Royal Air Maroc. Lynes so notifies me by email, saying that it would not be |

| | |
|---|---|
| | prudent for the firm to let me open any new matters because I will be leaving the firm soon. |
| **June 27, 2023** | **Email to Heller and Verde.** I send an email to Heller and Verde stating: <br><br> 1. They are trying to coerce me to resign from the firm and waive my ADEA and ERISA rights, rights under state antidiscrimination law, and claims for breach of the firm's partnership agreement.. <br><br> 2. I am ready to file complaints with the EEOC and EBSA, respectively, and state agencies. <br><br> 3. Terminating me or otherwise changing my status will constitute further retaliation against me. <br><br> 4. Even if they want to terminate the aviation practice, I stand ready to be redeployed to other practice groups (as they have done with the comparator, Brett Seifarth). <br><br> 5. The facts that show they have committed discrimination, coercion and retaliation. |
| **July 11, 2023** | **Email from Verde**. Verde (with Heller on copy) emails me to remind me the firm will terminate me if I do not agree to resign and waive my rights against the firm. In that email he again falsely tells me I have no rights under the ADEA or ERISA (not simply that the firm did not discriminate against me). |

| | |
|---|---|
| **July 18, 2023** | **Email to Heller and Verde**.  I send an email to Heller and Verde:<br><br>1.  Cautioning them not to further retaliate against me for asserting my rights under the ADEA and ERISA.<br><br>2.  Reiterating that I am covered by the ADEA and ERISA.<br><br>3.  Again describing their violations of these statutes. |
| **August 1, 2023** | **Heller suspends me without pay.**  Without notice Heller further retaliates against me and coerces me by suspending me without pay.  The suspension deprives me of the full month of pay payable by direct deposit to my bank account in the early morning on that date including funds I need to pay my bills including my mortgage on that date. |
| **August 1, 2023** | **Heller cuts off my access to firm systems.**  At 11:15 am, without notice, and knowing that I am in the middle of closing transactions for firm client Castlelake (an aircraft leasing company), Heller further retaliates against me by cutting off my access to Katten's email, telephone, and document-production systems. This conduct also constituted a breach by Heller and Katten of the  New York State rule of professional conduct for lawyers to perform services faithfully. |
| **August 2, 2023** | **Client is shocked.**  Castlelake sends me an email telling me it is "shocked" that Katten would hurt Castlelake this way. |

| August 2, 2023 | **Filing of complaints.** Heller emails me telling me he never wants to see me anywhere near the firm or him again. I file my complaint with the EEOC and a complaint for discrimination and retaliation under ERISA with EBSA. I notify Heller and Verde by email that I have done so. |
| --- | --- |
| August 4, 2023 | **Heller terminates me.** Heller retaliates against me for filing my complaints with the EEOC and EBSA by terminating me, without the required consent of the firm's executive committee, as of 4pm August 4. |
| August 11, 2023 | **Katten files Top Hat Plan statement**. Katten suddenly files a Top Hat Plan statement with EBSA for Katten's defined-benefit pension plan. Katten does so because it fears that in response to the complaint I filed on August 2 with EBSA, EBSA would soon confirm that I (and others like me participating the plan) am an employee and as a result the plan is subject to ERISA and requires that a one-time Top Hat Plan statement be filed. Once EBSA made such ruling, Katten's defined benefit pension plan would not be in compliance with ERISA because Katten had never filed the Top Hat Plan statement. This constitutes an admission that I am an employee covered by ERISA and federal anti-discrimination law such as the ADEA. |
| September 1, 2023 | **Katten fails to start repaying my capital.** Katten fails to make |

| | |
|---|---|
| | the first monthly installment of the repayment of my capital account. (The first installment is payable the first business day of the month after termination.) |
| **September 11, 2023** | **Katten will deduct balance of penalty from capital**.  Renee Lercher, Chief Financial Officer of Katten, emails me that the firm will start repaying my capital account but will first deduct the $51,406 of compensation the firm claims I have to repay. See March 21 entry above. |
| **November 13, 2023** | **Katten improperly withholds a tax refund payable to me.**  In November 2023**,** Katten makes an annual 'SALT-workaround" tax-overpayment refund to all lawyers employed in 2022 (even if not currently employed at Katten).  However, Katten does not make the payment to me, or give me any notice about it.  I email Katten Chief Financial Officer Renee Lercher on November 13 to ask about the payment.  She does not reply.  I email her again on November 29.  She does not reply.  I email her again, on January 3, 2024.  On January 9 she replies, admitting I am owed the payment, and finally sends the payment to me (in the amount of $35,797.00) on that date. |
| **November 18, 2024** | **Deprivation of pension.**  November 18, 2024 (my 62nd birthday) is the first day I would have qualified to immediately retire from Katten and start collecting my Katten defined-benefit |

| | pension, which I had been paying into since I started.  The pension would have been $140,000 per year payable by Katten and and would have increased for every additional year I still worked at Katten after November 18, 2024.  Heller fired me when he did to keep me from collecting this pension. |
|---|---|
| **March 2023 onward** | **Emotional distress.**  Heller and Verde's discrimination, coercion, and retaliation cause me constant anxiety and sleepless nights, for which I seek medical attention. |

Stewart B. Herman

1 Kings Ct

Morristown NJ 07960

201-572-1779

stewartherman1118@gmail.com

/s/ Stewart B. Herman

April 12, 2025